ACCEPTED
03-15-00044-CV
5603446
THIRD COURT OF APPEALS
AUSTIN, TEXAS
6/9/2015 2:15:01 PM
JEFFREY D. KYLE
CLERK

No. 03-15-00044-CV

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
6/10/2015 11:09:01 AM
JEFFREY D. KYLE
Clerk

TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
*Appellant,*

v.

MAURIE LEVIN, NAOMI TERR, AND HILARY SHEARD,
*Appellees.*

On Appeal from the
201st Judicial District Court of Travis County, Texas

## APPELLANT'S BRIEF

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

Scott A. Keller
Solicitor General

RICHARD B. FARRER
Assistant Solicitor General
State Bar No. 24055470

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1823
Fax: (512) 474-2697
richard.farrer@texasattorneygeneral.gov
COUNSEL FOR APPELLANT

ORAL ARGUMENT REQUESTED

**Appellant:** The Texas Department of Criminal Justice

**Lead Appellate Counsel**
Richard B. Farrer
Assistant Solicitor General
State Bar No. 24055470
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548
Tel.: (512) 936-1823
Fax: (512) 474-2697
richard.farrer@texasattorneygeneral.gov

**Additional Appellate and Trial Counsel**
Adam W. Aston
Joseph D. Hughes
Nichole Bunker-Henderson
David Alan Harris
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas  78711-2548

**Appellees:**  Maurie Levin, Naomi Terr, and Hilary Sheard

**Counsel for Appellees**
Philip Durst
State Bar No. 06287850
pdurst@ddollaw .com
Manuel Quinto-Pozos
State Bar No. 24070459
mqp@ddollaw.com
DEATS, DURST, OWEN & LEVY P.L.L.C.
1204 San Antonio, Suite 203
Austin, Texas 78701
Telephone: (512) 474-6200

Facsimile: (512) 474-7896

Maurie Levin
State Bar No. 00789452
MAURIE LEVIN, ATTORNEY AT LAW
211 South Street, #346
Philadelphia, PA 19147
(512) 294-1540
(215) 733-9225 (fax)
maurielevin@gmail.com

# TABLE OF CONTENTS

Identity Of Parties And Counsel.................................................................i

Index Of Authorities.................................................................vii

Statement Of The Case .................................................................x

Statement Regarding Oral Argument .................................................xi

Issues Presented.................................................................xii

Introduction.................................................................1

Statement Of Facts .................................................................3

    A.    Disclosure Of The Woodlands Compounding Pharmacy's Identity In 2013 Creates A Firestorm .................................3

    B.    A Pharmacy In Tulsa Receives A Disturbing Email From An Individual Named Nick Humez.................5

    C.    TDCJ Requests A DPS Threat Assessment .................7

    D.    Plaintiffs Submit A PIA Request And Later Challenge An OAG Letter Ruling Finding The Identity Of The Pharmacy Supplying Texas's Pentobarbital Should Not Be Disclosed. .................12

    E.    Plaintiffs Sue To Compel Disclosure And Obtain A TRO, Which The Texas Supreme Court Stays.................14

    F.    TDCJ Obtains A Further Expert Opinion And Plaintiffs Obtain An Expert Opinion Of Their Own. .................15

    G.    The Legislature Removes Any Doubt That The Identity Of Texas's Supplier Of Execution Drugs Is Not An Appropriate Subject For PIA Requests. .................18

Summary Of Argument.................................................................18

Standard Of Review ........................................................................21

Argument........................................................................................23

I.   *Texas Department Of Public Safety v. Cox* Defines The
     Contours Of The Physical-Safety Exception To Mandatory
     Disclosure Under the PIA. ..........................................................23

     A.   *Cox* Provides That The Physical-Safety Exception Can
          Be Established Through Detailed Evidence Or Expert
          Testimony. ........................................................................24

     B.   Threat Assessments From Law-Enforcement Agencies
          Receive Deference. ............................................................25

     C.   *Cox* Shows How The Physical-Safety Exception Ought
          To Apply. ...........................................................................27

          1.   *Cox* Shows Courts Should Ordinarily Not Second-
               Guess Law-Enforcement Threat Assessments............28

          2.   *Cox* Shows Information Should Be Withheld If It
               Is Connected To The Threated Harm.........................29

          3.   *Cox* Also Shows The Limits Of The Exception. ...........30

II.  The Court Should Reverse And Render Judgment Because
     The Physical-Safety Exception Is Satisfied As A Matter Of
     Law. ...........................................................................................31

     A.   The    Requested    Disclosure    Would    Substantially
          Threaten Physical Harm....................................................31

          1.   The Humez Email Is Detailed Evidence Of A
               Substantial Threat Of Harm That Is Connected To
               The Requested Information. ......................................32

          2.   The "Firestorm" Surrounding The Woodlands
               Pharmacy Is Detailed Evidence Of A Substantial

iv

Threat Of Harm That Is Connected To The Requested Information. ...............................34

3. The Exploding-Head Blog Posting Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information. .............35

4. Law Enforcement's Reaction To The Woodlands Pharmacy "Firestorm" Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information. ........................................35

5. Brad Livingston's Testimony Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information. .................36

6. McCraw's Threat Assessment Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information And Is Entitled To Deference. .............................................38

B. The Assessments Provided By TDCJ's Experts Independently Establish The Exception As A Matter Of Law. ..............................................................................42

1. McCraw's Opinion Demonstrates A Substantial Threat Of Physical Harm.............................................43

2. Cunningham's Opinion Demonstrates A Substantial Threat Of Physical Harm.........................44

C. Plaintiffs' Arguments Below Misunderstood The Governing Standards. ........................................................47

1. Plaintiffs' Arguments Below Assumed An Incorrect Legal Standard.............................................48

2. Plaintiffs' Efforts To Create A Battle Of Experts On An Issue With Immediate Public-Safety Implications Is Misguided............................................50

v

D. Plaintiffs' Expert's Testimony Should Not Have Been Considered And, In Any Event, Could Not Undermine TDCJ's Experts' Testimony. .................................................51

1. Parker Is Not Qualified.................................................52

2. Parker's Opinion Does Not Have A Sufficient Basis And Is Unreliable........................................................53

III. In The Alternative And At The Very Least, The Court Should Remand Because Plaintiffs Cannot Show Entitlement To Judgment As A Matter Of Law.......................................................57

Prayer ..................................................................................58

Certificate of Service .............................................................60

Certificate of Compliance .......................................................61

# INDEX OF AUTHORITIES

## Cases

*Al's Formal Wear of Houston, Inc. v. Sun,*
    869 S.W.2d 442 (Tex. App.—Houston [1st Dist.]
    1993, writ denied)..............................................................22-23

*Anderson v. Snider,*
    808 S.W.2d 54 (Tex. 1991) (per curiam) .................................. 17, 44

*Broders v. Heise,*
    924 S.W.2d 148 (Tex. 1996).......................................................52

*Calhoun v. Killian,*
    888 S.W.2d 51 (Tex. App.—Tyler 1994, writ denied) ....................22

*City of Fort Worth v. Cornyn,*
    86 S.W.3d 320 (Tex. App.—Austin 2002, no pet.) ...................22, 31

*City of Garland v. Dallas Morning News,*
    22 S.W.3d 351 (Tex. 2000).......................................................22, 31

*E.I. du Pont de Nemours & Co. v. Robinson,*
    923 S.W.2d 549 (Tex. 1995).......................................................52, 54

*Merrell Dow Pharms., Inc. v. Havner,*
    953 S.W.2d 706 (Tex. 1997).......................................................53

*Office of Pub. Util. Counsel v. Texas-New Mexico Power Co.,*
    344 S.W.3d 446 (Tex. App.—Austin 2011, pet. denied).................26

*Sells v. Livingston,*
    561 F. App'x 342 (5th Cir. 2014) (per curiam)...........................2, 15

*Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers L.P.,*
    343 S.W.3d 112 (Tex. 2011)  ...............................................*passim*

*Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.,*
    253 S.W.3d 184 (Tex. 2007)...................................................21, 22

*Thomas v. Cornyn,*
        71 S.W.3d 473 (Tex. App.—Austin 2002, no pet.) ........................22

*Transcon. Ins. Co. v. Crump,*
        330 S.W.3d 211 (Tex. 2010).........................................................52

*Whirlpool Corp. v. Camacho,*
        298 S.W.3d 631 (Tex. 2009).........................................................54

**Statutes**

TEX. GOV'T CODE §552.021..................................................................23

TEX. GOV'T CODE §552.022..................................................... xi, 23, 24

TEX. GOV'T CODE §552.101..........................................................xi, 23

TEX. GOV'T CODE §552.152..................................................................23

TEX. GOV'T CODE §552.301..................................................................13

TEX. GOV'T CODE §552.301(b) .............................................................25

TEX. GOV'T CODE §552.301(e) .............................................................26

TEX. GOV'T CODE §552.1081.................................................................18

**Rules**

Tex. R. Civ. P. 166a(c) ............................................................17, 44, 57

Tex. R. Evid. 401-03 ...........................................................................51

Tex. R. Evid. 702 ....................................................................51, 52, 53

Tex. R. Evid. 703 .................................................................................53

**Other Authorities**

7 WILLIAM DORSANEO III, TEXAS LITIGATION GUIDE
        §101.07[3][a] (2014)....................................................................57

Act of May 20, 2015, 84th Leg., R.S., S.B. 1697 ...................................... 18

ALEX WILSON ALBRIGHT, TEXAS COURTS A SURVEY 461
    (Imprimatur Press) (2010-2011) ................................................... 57

Crime in the United States 2012, at
    http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-
    u.s/2012/crime-in-the-u.s.-2012/violent-crime/ violent-
    crime (last visited June 4, 2015) .................................................. 45

Tex. Att'y Gen. OR2014-09184 (2014) ................................................. x, 13

## STATEMENT OF THE CASE

*Nature of the Case*:

This is an appeal from a final order on cross-motions for summary judgment involving a challenge, under the Texas Public Information Act (PIA), to a Texas Attorney General Open Records ruling. *See* Tex. Att'y Gen. OR2014-09184 (2014). Plaintiffs seek disclosure of information pertaining to the identity of the pharmacy that supplied compounded pentobarbital for use in Texas's execution protocol. *See* CR.5-68, 388-447, 730. In response to the information request, the Texas Department of Criminal Justice (TDCJ) invoked the physical-safety exception to disclosure. *See Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers L.P.*, 343 S.W.3d 112 (Tex. 2011).

*Course of Proceedings*:

The parties filed cross-motions for summary judgment. *See* CR.520-729 (TDCJ); CR.730-1907 (Plaintiffs).

*Trial Court*:

The Honorable Darlene Byrne, 201st District Court, Travis County, Texas.

*Trial Court Disposition*:

The court granted Plaintiffs' motion and denied TDCJ's motion. CR.2297. It severed the remaining issues on attorney's fees and costs, thereby making its merits determination final and appealable. CR.2305-06.

x

## STATEMENT REGARDING ORAL ARGUMENT

The State requests oral argument. This appeal appears to present the first opportunity for a Texas appellate court to substantively address the physical-safety exception to mandatory disclosure of public information since the Texas Supreme Court first recognized the exception in *Texas Department of Public Safety v. Cox*, 343 S.W.3d 112 (Tex. 2011). The exception embodies the balance between the right to physical safety and the public's interest in accessing public information, and the Court's decision will likely impact potentially dangerous and sensitive situations beyond the current dispute about access to information on the compounding pharmacy supplying Texas's execution drugs.

The district court's ruling implicitly credits Plaintiffs' arguments that misunderstand *Cox* and incorrectly frame the legal standard governing the physical-safety exception. Those arguments dilute the exception, unacceptably raise the evidentiary bar for satisfying it, and, if given credence by this Court, threaten an unacceptable risk of physical harm to the public resulting from the disclosure of sensitive information, in both this case and future cases.

**ISSUES PRESENTED**

1. Whether the district court erred in denying TDCJ's motion for summary judgment and granting Plaintiffs' cross-motion for summary judgment because TDCJ demonstrated that the requested information is subject to the physical-safety exception to public disclosure as a matter of law.

2. Whether, in the alternative, Plaintiffs at most raised a genuine issue of material fact with respect to the physical-safety exception such that a trial on the merits is required.

**INTRODUCTION**

This appeal involves the physical-safety exception to the PIA's general requirement that public information be disclosed to requestors. No appellate court has yet substantively reviewed a district court ruling applying or rejecting the exception since the Supreme Court announced it in *Cox*. This Court's decision, therefore, will set the stage for the exception's application across a wide range of potential scenarios involving public-safety concerns.

There is, however, a danger that this appeal could become sidetracked due to the initial basis for Plaintiffs' request for disclosure. Plaintiffs initially invoked prohibitions on cruel and unusual punishment when they requested disclosure of a wide range of information on Texas executions, including Texas's execution protocol, test results on the drug used, and information identifying Texas's provider of the drug. Texas has disclosed all the requested information except the identity of the drug provider. In related federal litigation, the Fifth Circuit found that the federal constitutional right to be free from cruel and unusual punishment is *not* implicated by a request for information identifying a State's

provider of execution drugs in situations like the one presented here. *See Sells v. Livingston*, 561 F. App'x 342 (5th Cir. 2014) (per curiam).

Nonetheless, the narrow issue in dispute—the applicability of the physical-safety exception to a request for disclosure of public information—remains an important one. The exception balances the public's important statutory right of access to public information with extremely serious public-safety concerns. The balance is a delicate one, and in announcing the exception *Cox* wisely placed a thumb on the public-safety side of the scale. Accordingly, *Cox* requires deference to law-enforcement assessments of the "probability of harm." The touchstone of the analysis under the exception, *Cox* advised, is a connection between the threatened harm and the specific information requested.

The circumstances of this case satisfy all that *Cox* requires to enforce the exception, and much more. Here, there is specific evidence of a highly charged, potentially dangerous atmosphere surrounding the requested information. TDCJ offered two expert assessments of an unacceptably high "probability of harm," as *Cox* describes it, should the identity of the execution-drug supplier be disclosed. One of those assessments comes from the Director of the Texas Department of Public

Safety, the other from a law-enforcement expert. And there is ample evidence connecting the disclosure of the identity of the execution-drug supplier with the threatened harm. Plaintiffs, for their part, offered an expert opinion that challenges only the severity of the "probability of harm," and declines to address the connection between the requested information and the potential harm identified by TDCJ's experts. In these circumstances, the district court should have deferred to TDCJ's experts' assessments of an unacceptably high probability of harm, noted the conclusive evidence of a direct connection between the threatened harm and the information requested, and held that the physical-safety exception is satisfied as a matter of law.

The Court should reverse the district court and clarify the standards for the physical-safety exception as well as their application.

**STATEMENT OF FACTS**

**A. Disclosure Of The Woodlands Compounding Pharmacy's Identity In 2013 Creates A Firestorm.**

In the fall of 2013, the public learned that the Woodlands Compounding Pharmacy was supplying Texas with pentobarbital for use in executions. In the immediate wake of that public disclosure, the pharmacy and its pharmacist received a significant amount of hate mail.

3

*E.g.*, CR.581-88 (examples of emails); CR.558 (Affidavit of Brad Livingston noting, "TDCJ and selling pharmacies have long been concerned about the safety of the pharmacists providing the drugs used in executions, based on hate mail and threats to the pharmacists"); CR.778 (news article quoting a letter from the pharmacist referencing "hate mail and messages" received following the disclosure of the pharmacy's identity). The pharmacist characterized the situation resulting from the disclosure as a "firestorm." CR.1859 ("Now that the information has been made public, I find myself in the middle of a firestorm.").

An October 6, 2013 blog posting contributed to the "firestorm." CR.578-79. It includes a depiction of a man with an exploding head, over which a heading reads, "The Pharmacist who approves the business of killing, but only under the veil of secrecy." CR.578. "Meet the pharmacist," the posting continues, "who sold the medical ethics [sic] and shamed his profession for $2,800, **Mr. Jasper Lovoi, RPh**." *Id.* (emphasis in original).

The "firestorm" surrounding the release of the identity of the Woodlands Compounding Pharmacy was a significant event for both law

4

enforcement and the pharmacy itself. The TDCJ Office of the Inspector General and the Montgomery County Sheriff's Office sent officers to observe and provide security at an October 9, 2013 protest of the pharmacy. CR.564; CR.729. And the pharmacy sent a letter to the TDCJ "demand[ing] that TDCJ immediately return the vials of compounded pentobarbital" already provided by the pharmacy. CR.1858-59.

### B.   A Pharmacy In Tulsa Receives A Disturbing Email From An Individual Named Nick Humez.

Shortly thereafter, the environment surrounding compounding pharmacies supplying execution drugs took a further turn for the worse. On January 29, 2014, an individual named Nick Humez sent an email to the Apothecary Shop in Tulsa, Oklahoma, upon learning that the pharmacy was a possible supplier of Missouri's execution drugs. CR.590. The email queries whether providing execution drugs is "prudent" and recommends "were I you [the pharmacy] I'd at least want to beef up my security now that you've been put in the spotlight." *Id.* "As the folks at the [Murrah] federal building can tell you," the email explains, "it only takes one fanatic with a truckload of fertilizer to make a real dent in business as usual." *Id.* "In your place," the email continues, "I'd either swear to the nation that my company didn't make execution drugs of ANY

sort, and then make dang sure that's true, or else openly accept the burden of putting my employees and myself at unacceptable (and possibly uninsurable) risk." *Id.*

Needless to say, the email got the authorities' attention. Federal agents questioned Humez about it and his underlying intentions in connection to the Apothecary Shop. *See* CR.593-95.

Humez later discussed the reasoning motivating his email. He explained—to Plaintiff Levin, no less—that in drafting and sending the email he was attempting to impress upon the Apothecary Shop what he considered a very obvious danger of physical harm that the pharmacy employees, and others, face after the pharmacy was identified as a possible supplier of execution drugs:

> I wanted to make clear that *now that it was generally known* that the Apothecary Shoppe [sic] was in fact supplying such toxins, even if they did not see it as simply wrong, they needed to be aware that many others did, and that *some of them might be dangerous to them*, their employees, and the *surrounding bystanders* if even one fanatic . . . with a rudimentary knowledge of improvised explosives chose to go on the attack. I felt, and thought I had made it clear, that *they would be reckless not to consider this possibility and to take appropriate action at the very least to protect against it*, as I would surely do were I in their place.

6

CR.593 (emphases added). Humez further clarified to Plaintiff Levin that his "intention . . . [was] to warn some apparently ignorant people of the *heightened risk* they were taking on now that the nature of their activities was known nationwide." CR.593-94 (emphasis added). Finally, and in case there was any doubt regarding his views, Humez also noted:

> I do know that *there are extremists in the right-to-life movement* who would regard destroying a death drug factory as equally justified with blowing up an abortion clinic or . . . bombing the tracks that led to Auschwitz.

CR.595 (emphasis added).

### C.    TDCJ Requests A DPS Threat Assessment.

TDCJ learned about Humez's email to the Apothecary Shop in February 2014. *See* CR.699-700, 704. At the time, TDCJ was in the process of finding a new provider for pentobarbital to use in Texas executions. *See* CR.699-700, 704. Given the "firestorm" surrounding the release of the Woodlands Compounding Pharmacy's identity, and given Humez's recent email to the pharmacy in Oklahoma, TDCJ's Executive Director, Brad Livingston, grew concerned about public safety in connection with the possible future disclosure of the identity of the eventual new supplier of Texas's execution drugs. *See* CR.639-40; CR.701-06.

7

Livingston's concerns were further heightened by the fact that the director of Colorado's Department of Corrections had been assassinated the previous March, and that Livingston had personally received a number of death threats both prior to and after that horrific event. CR.704-05. In sum, Livingston felt that "the world I live in" and the "security risks that are inherent in . . . the criminal justice world [ ] had escalated in general and specifically over the last number of months." CR.704.

Anticipating the inevitable PIA requests for information about Texas's eventual new execution-drug provider, and consistent with his appraisal that the criminal-justice environment contained "security risks . . . that had escalated in" recent times, *id.*, Livingston requested a threat assessment from the Director of the Texas Department of Public Safety (DPS), Col. Steven McCraw. *See* CR.639-40; CR.701-06. Livingston knew that an assessment would be needed quickly, given that PIA requests would likely be submitted as soon as TDCJ obtained the pentobarbital. CR.639-40; CR.701-06.

McCraw provided the requested threat assessment on March 7, 2014. His assessment concluded, in no uncertain terms, that revealing

8

the identity of the compounding pharmacy posed a substantial risk of physical harm:

> Pharmacies by design are easily accessible to the public and present a soft target [for] violent attacks. It is our assessment that publicly linking a pharmacy or other drug supplier to the production of controlled substances to be used in executions presents a substantial threat of physical harm to the pharmacy, other drug supplier and its personnel and should be avoided to the greatest extent possible.

CR.556.

McCraw has a wealth of expertise and experience in providing threat assessments. He began his law-enforcement career in 1977 and served for 21 years in the Federal Bureau of Investigation. CR.630. To this day, McCraw has retained a high level security clearance issued by the federal government, and he routinely receives classified and unclassified material and briefings on current and future criminal and terrorism threats. CR.631. Further, McCraw serves as a member of the International Association of Chiefs of Police Committee on Terrorism and the Department of Justice Bureau of Justice Assistance Law Enforcement Forecasting Group, and he benefits from access to threat information and national experts who serve on those committees. *Id*.

9

DPS, where McCraw serves as Director, routinely conducts threat assessments on people and places, and it produces state-wide public safety and homeland-security threat assessments in several areas. *Id.* DPS threat assessments cover a variety of public-safety issues, including terrorism, security, and other types of threats. CR.634.

Immediately prior to joining DPS, McCraw served as Director of Homeland Security in Texas, where he established a state-wide, multidisciplinary process to assess homeland-security and public-safety threats and vulnerabilities on terrorism, crime, pandemic, disease, natural disasters and industrial accidents. CR.631.

McCraw had high-level experience with law enforcement and threat assessments while serving with the FBI, in addition to his relevant experience while with Homeland Security in Texas and DPS. For example, at the time he retired from the FBI, McCraw was the Assistant Director of the Inspection Division within the FBI and reported directly to the FBI Director. *Id.* Earlier in his FBI career, McCraw established an organizational threat process and oversaw threat assessments of major drug-trafficking organizations. CR.632.

McCraw's FBI career also included a stint as the first Unit Chief of the Latin America and Caribbean Organized Crime/Drug Unit, where he oversaw a combined DEA and FBI Threat Assessment Team. *Id.* He also served in Arizona as the FBI's first Assistant Special Agent in Charge of the Tucson Resident Agency in the Phoenix Field Office, where his responsibilities included overseeing developing a comprehensive threat assessment for Southern Arizona. CR.633. In addition, he spent time as Deputy Assistant Director in the Investigative Support Division, a position in which he conducted threat assessments on the new FBI Director and the new Attorney General. *Id.*

Following the September 11 terrorist attacks, McCraw was selected by the President to serve as the Director of the Foreign Terrorism Tracking Task Force where he reported directly to Deputy Attorney General Larry Thompson at the Department of Justice and oversaw two threat assessments requested by the U.S. Attorney General. *Id.* Following another promotion within the FBI, McCraw served as Assistant Director, a position in which he oversaw several threat assessments across the full spectrum of FBI responsibilities. CR.634.

**D. Plaintiffs Submit A PIA Request And Later Challenge An OAG Letter Ruling Finding The Identity Of The Pharmacy Supplying Texas's Pentobarbital Should Not Be Disclosed.**

Plaintiffs Maurie Levin, Hilary Sheard, and Naomi Terr serve as counsel for capital defendants. On March 18, 2014, citing the need to safeguard prisoners' rights under the Eighth Amendment, Article I §13 of the Texas Constitution, and Article 43.24 of the Texas Code of Criminal Procedure, Plaintiffs requested under the PIA the following information relating to executions performed in Texas:

- "the execution protocol by which [Texas] intend[s] to carry out . . . scheduled execution[s],"

- "the drug or drugs, including back-up, [Texas] intend[s] to use,"

- "the source of those drugs,"

- "the date [the drugs were] ordered and received, and"

- "any testing conducted to ensure potency, purity, and integrity."

CR.20-21; *see* CR.22.

Although TDCJ released some of the requested information, it claimed that some of it may be withheld from disclosure under the PIA's provisions. On March 25, 2014, TDCJ requested an open records decision from the Office of the Texas Attorney General on whether the requested

12

information may be withheld from disclosure under the physical-safety and other disclosure exceptions. *See* TEX. GOV'T CODE §552.301. In support of its request to withhold the information, TDCJ provided the McCraw threat assessment and supporting documentation (including emails to the Woodlands Compounding Pharmacy, the "exploding head" blog posting, and the Humez email).

On May 29, 2014, the Office of the Attorney General issued a letter ruling finding that information identifying the pharmacy (and pharmacist) is subject to the physical-safety exception and, therefore, should not be disclosed. *See* CR.550-54; Tex. Att'y Gen. OR2014-09184 (2014).

Ultimately, TDCJ released to the requestors all the requested information, including test results, *see, e.g.*, CR.408, except information identifying the pharmacist and licensed compounding pharmacy that most recently supplied pentobarbital to Texas for use in executions. *See* CR.524. TDCJ also divulged that the unnamed pharmacy is a licensed compounding pharmacy open to the public and located in an urban area of a Texas city. CR.561.

### E. Plaintiffs Sue To Compel Disclosure And Obtain A TRO, Which The Texas Supreme Court Stays.

Meanwhile, on March 26, 2014—the day after TDCJ requested an open-records ruling—Plaintiffs filed suit in Travis County District Court seeking, among other things, a TRO directing TDCJ to immediately produce to Plaintiffs the information identifying the pharmacy. CR.5-68. Plaintiffs also sought a temporary injunction and writ of mandamus under TEX. GOV'T CODE §552.321 to compel disclosure of the information.

On March 27, 2014, the district court found that "if the disclosure of this information is not ordered immediately, [Plaintiffs' clients on death row] will suffer irreparable injury because [their] constitutional right to be free from cruel and unusual punishment cannot be protected in the absence of the requested information." CR.266. Accordingly, the court granted a TRO requiring disclosure to Plaintiffs and their counsel, and it ordered a hearing on the requested temporary injunction for April 10, 2014. CR.266-68.

TDCJ promptly filed a petition for writ of mandamus and a stay motion in the Texas Supreme Court. The Court stayed the district court's TRO later that same day. CR.270. The Court ultimately denied TDCJ's mandamus petition as moot because the TRO expired while the stay was

14

in effect, and the temporary-injunction hearing was likewise cancelled by the stay order. CR.305.

On April 2, two inmates represented by Plaintiffs sought and obtained a preliminary injunction in federal district court, which stayed the inmates' executions and ordered discovery (under a protective order) that would reveal the identity of the compounding pharmacy. The Fifth Circuit promptly vacated the stays and disclosure orders for both inmates, and in doing so rejected arguments that the right to be free from cruel and unusual punishment requires disclosure of the identity of the pharmacy providing the pentobarbital. *See Sells*, 561 F. App'x at 344-45.

F.      TDCJ Obtains A Further Expert Opinion And Plaintiffs Obtain An Expert Opinion Of Their Own.

In connection with the underlying state court mandamus litigation brought under TEX. GOV'T CODE §552.321, TDCJ retained the services of a second law-enforcement expert, J. Lawrence Cunningham, to conduct a comprehensive threat assessment. Like DPS Director McCraw, Cunningham concluded that the disclosure of the pharmacy's identity would substantially threaten physical harm:

> Based on the totality of my diverse threat assessment training and experience in the public and private sectors, my review of the documents listed above, and open source publications, I

15

conclude that there is a significant and substantial threat of physical harm to the pharmacy/compounding pharmacy and pharmacist, and others in the vicinity of the pharmacy/compounding pharmacy if the identity of the pharmacy/compounding pharmacy or pharmacist is publicly disclosed.

CR.625, 562-76.

As with Col. McCraw, Cunningham's qualifications to serve as an expert are extensive. *See* CR.605-28; *see also* CR.597-603 (Cunningham *curriculum vitae*). Cunningham had a 20-year career as a secret service agent, during which he supervised a major field office, conducted lead security advances, and performed risk assessments for world leaders attending major events. CR.600. More recently as a consultant, he has evaluated, developed, and implemented integrated response plans, security training programs, and security policies. *Id.*

Cunningham currently works as a consultant conducting risk assessments and security training for clients including the Department of Homeland Security, the Defense Threat Reduction Agency, a number of foreign and domestic corporations, and even foreign governments. *Id.* He also currently holds several Department of Homeland Security teaching certifications and serves as an adjunct faculty member of the National Domestic Preparedness Consortium, where he develops and

16

evaluates courses and seminars on preventing and countering terrorism and other threats of violence. CR.600-01.

Prior to his current position, Cunningham served as an International Security Expert for the U.S. State Department and as a Security Supervisor in charge of dignitary security for the Stanford University World Cup Soccer venue. CR.601.

Cunningham's 20-year career in the Secret Service is striking. He served in the Presidential Protective Division at the White House and taught courses and revised curricula dealing with training all levels of Secret Service personnel. CR.601-02. He earned seven Performance Awards and the Albert Gallatin Award for 20 years of meritorious government service. CR.602.

TDCJ also provided the opinion of Brad Livingston, which they offered as the opinion of an interested expert under Texas Rule of Civil Procedure 166a(c) and cases like *Anderson v. Snider*, 808 S.W.2d 54, 55 (Tex. 1991) (per curiam).

Plaintiffs submitted an expert opinion of their own, from Thomas Parker. Parker did not offer his own threat assessment but instead only discussed the opinions of TDCJ's experts, ultimately concluding that no

17

threat assessment could be made under the circumstances. *See* CR.804-05. Plaintiffs also submitted affidavits from Plaintiff Levin and Manuel Quinto-Pozos, an attorney representing Plaintiffs in this matter.

The parties filed cross-motions for summary judgment. The district court granted Plaintiffs' motion and denied TDCJ's motion. CR.2297.

### G. The Legislature Removes Any Doubt That The Identity Of Texas's Supplier Of Execution Drugs Is Not An Appropriate Subject For PIA Requests.

On May 28, 2015, Governor Abbott signed into law SB 1697, which goes into effect September 1, 2015, and applies prospectively to PIA requests made after that date (and so does not control this case). It provides, in pertinent part, that "[i]nformation is excepted from the requirements of Section 552.021" of the PIA "if it contains identifying information . . . , including" information that identifies:

> any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution.

Act of May 20, 2015, 84th Leg., R.S., S.B. 1697, §552.1081 (to be codified at TEX. GOV'T CODE §552.1081).

### SUMMARY OF ARGUMENT

*Cox* defines the contours of the physical-safety exception and points the way to the correct disposition of this appeal. *Cox* provides that the

18

physical-safety exception can be established through detailed evidence or expert testimony. *Cox* further provides that an assessment from DPS or other law-enforcement agencies or experts on the probability of harm is entitled to deference from the courts. The key to withholding information under the exception is a connection between the requested information and the harm about which law enforcement has expressed concern. Where evidence or expert testimony shows such a connection, the information should qualify for the exception. It is only where a connection is lacking that a more robust evidentiary showing is required to justify withholding the information.

Here, TDCJ demonstrated its entitlement to judgment, through detailed evidence and expert testimony establishing the exception as a matter of law. The detailed evidence that shows a substantial threat of harm that is connected to the release of the requested information includes: (1) the email from Nick Humez referencing the bombing of the Murrah federal building in Oklahoma and noting the existence of extremists willing to commit violent acts in connection with their opposition to the death penalty; (2) the "firestorm" of hate mail and vitriol surrounding the disclosure of the Woodlands Pharmacy as a supplier of

19

execution drugs; (3) the exploding-head blog identifying the Woodlands Compounding Pharmacy's pharmacist as a supplier of execution drugs and superimposing that information with a depiction of a man's head exploding; (4) the reasonable decision by law enforcement to monitor and police a protest at the Woodlands Pharmacy; (5) Brad Livingston's testimony regarding his public-safety concerns in connection with the possible disclosure of the identity of the Texas's supplier of execution drugs; and (6) DPS Director McCraw's assessment that there is a substantial likelihood of physical harm should the identity of the supplier be disclosed.

The detailed evidence is independently confirmed by the expert opinions of both McCraw and Cunningham, which are entitled to receive—and should receive—deference.

Plaintiffs' arguments below challenging McCraw and Cunningham miss the mark. To start, Plaintiffs continually presented the district court with improper formulations of the governing standard. Further, Plaintiffs' efforts to turn application of the exception into a "battle of the experts" are misguided. *Cox* contemplates deference to DPS and other law-enforcement agency threat assessments, not a war of experts in every

case, with the public's safety hanging in the balance. Plaintiffs' expert Parker's testimony, in any event, does nothing to undermine the detailed evidence demonstrating TDCJ's establishment of the exception as a matter of law, or to undermine TDCJ's expert's opinions. Parker is not qualified, and his opinions lack a sufficient basis and are unreliable.

The foregoing establishes TDCJ's entitlement to judgment as a matter of law, and the Court should reverse the district court and render judgment for TDJC.

Finally, because Plaintiffs at most could only raise a genuine issue of material fact regarding the physical-safety exception, the case (at worst) should be remanded for trial on the merits.

## STANDARD OF REVIEW

Although the denial of a summary judgment motion typically is not reviewable, review is appropriate here because the district court ruled on cross-motions for summary judgment, and because it severed its summary-judgment order. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007). Because TDCJ raised an exception to mandatory disclosure under the PIA as the basis for its summary judgment request, TDCJ bore the burden in the district court

21

of demonstrating that the exception is satisfied. *See, e.g.*, *Thomas v. Cornyn*, 71 S.W.3d 473, 488 (Tex. App.—Austin 2002, no pet.) ("[W]e hold that a governing body should bear the burden of proving in a judicial proceeding that an exception to disclosure applies."). Likewise, Plaintiffs bore the burden to show their entitlement to judgment; cross-motions for summary judgment require that "each party bears the burden of establishing that it is entitled to judgment as a matter of law." *City of Garland v. Dallas Morning News*, 22 S.W.3d 351, 356 (Tex. 2000); *City of Fort Worth v. Cornyn*, 86 S.W.3d 320, 322 (Tex. App.—Austin 2002, no pet.).

This Court reviews the district court's ruling on summary judgment cross-motions *de novo* by examining the evidence, determining all issues presented, and rendering the judgment the district court should have rendered. *Tex. Mun. Power Agency*, 253 S.W.3d at 192. If neither party has satisfied its burden to show it is entitled to judgment as a matter of law, and disputed issues of fact therefore remain, a reviewing court should remand the case for trial on the merits. *E.g.*, *Calhoun v. Killian*, 888 S.W.2d 51, 54 (Tex. App.—Tyler 1994, writ denied); *Al's Formal Wear*

*of Houston, Inc. v. Sun*, 869 S.W.2d 442, 444 (Tex. App.—Houston [1st

Dist.] 1993, writ denied).

**ARGUMENT**

**I.** ***TEXAS DEPARTMENT OF PUBLIC SAFETY V. COX* DEFINES THE CONTOURS OF THE PHYSICAL-SAFETY EXCEPTION TO MANDATORY DISCLOSURE UNDER THE PIA.**

Under the PIA, "public information is available to the public" upon

request, TEX. GOV'T CODE §552.021, "subject to certain exceptions." *Cox*,

343 S.W.3d at 114. Some exceptions are specified in the PIA's text;[1]

others arise from the common law or other law and are incorporated into

the PIA's scheme by other PIA provisions. *See, e.g.*, TEX. GOV'T CODE

§§552.101 & 552.022. "Th[e] exceptions embrace the understanding that

the public's right to know is tempered by the individual and other

interests at stake in disclosing that information."[2] *Cox*, 343 S.W.3d at

---

[1] There is a statutory public-safety exception—not at issue here—that involves information "that relates to an employee or officer of [a] governmental body." TEX. GOV'T CODE §552.152.

[2] The PIA also involves another issue that features in, and often complicates, the PIA case law but that is not particularly relevant for present purposes. In 1999, amendments to the PIA excluded "certain categories of public information from the [PIA's] exceptions" to disclosure. *Id*. Those categories of information—often referred to as core-public or super-public information—are listed in §552.022. Under the 1999 amendments, information falling into a §552.022 category was protected from disclosure only if it was "expressly confidential under other law." *Id*. (internal quotation marks omitted). "'Other law,'" for the 1999 amendment's purposes,

23

114. One such exception is the physical-safety exception, which derives from the common law, was announced in *Cox*, and is at issue here.

## A. *Cox* Provides That The Physical-Safety Exception Can Be Established Through Detailed Evidence Or Expert Testimony.

*Cox* announced as a matter of first impression that information requested for disclosure under the PIA may be withheld, under a common-law physical-safety exception, if disclosure "would substantially threaten physical harm." 343 S.W.3d at 119.

*Cox* explains that the exception requires courts to "closely examine each of the disputed documents" subject to a disclosure request; the "dividing line between disclosure and restraint" as to each document is "determined by proof." *Id*. at 118-19. The requisite proof that disclosure

---

"include[d] other statutes [apart from the PIA], judicial decisions, and rules promulgated by the judiciary." *Id*.

The core-public designation is tangential to the issues presented here because under *Cox*, §552.022's "other law" includes the common law right to be free from physical harm. *Id*. at 118. *Cox*'s physical-safety exception to mandatory disclosure, in other words, applies to core-public information.

The Legislature later amended §552.022 for disclosure requests coming after September 1, 2011, to provide that information falling into a §552.022 category may be protected from disclosure if it is confidential "under this chapter or other law." TEX. GOV'T CODE §552.022.

24

would substantially threaten physical harm may come through *either* "detailed evidence *or* expert testimony." *Id.* at 119 (emphasis added).

## B. Threat Assessments From Law-Enforcement Agencies Receive Deference.

*Cox* recognizes the utility of a law-enforcement expert's assessment "about the probability of harm" surrounding a proposed release of information. *Id.* If the assessment comes from "DPS officers" or "other law enforcement experts," "a certain amount of deference *must* be afforded" to it. *Id.* (emphasis added). In *Cox*, for example, the Court required deference to an assessment of risk from DPS even though DPS was a party to the litigation. *Id.*

The PIA's statutory scheme provides governmental bodies, like the TDCJ in this case, only a short amount of time to determine whether the requested information qualifies for an exception to disclosure. This means that a law-enforcement assessment "about the probability of harm" may in some cases be somewhat abbreviated. Indeed, a governmental body subject to a PIA request by statute has only 10 days either to produce requested information or seek a ruling from the Open Records Division of the Office of the Attorney General on whether the information may be withheld. *See* TEX. GOV'T CODE §552.301(b). If a

25

ruling is sought, the governmental body has only 15 days from the initial information request to submit written comments to the Office of the Attorney General stating why the information qualifies for exception from disclosure.  *Id.* §552.301(e).

This accelerated timeline and *Cox*'s required deference to a DPS or law-enforcement-expert assessment means that assessments of public-safety risk must be taken seriously and ordinarily should receive deference from the courts, even when they are provided in relatively short order.  After all, law enforcement officials are *the* experts on public safety issues, including ones that come to light quickly.  It makes sense that their assessments of public-safety threats should be respected, absent a significant showing to the contrary.  *Cf. Office of Pub. Util. Counsel v. Texas-New Mexico Power Co.*, 344 S.W.3d 446, 450 (Tex. App.—Austin 2011, pet. denied) (agency determination in an area of agency expertise is reviewed for substantial evidence, which requires presumption that it is supported by substantial evidence and requires complaining party to overcome that presumption).

Recognizing that deference is owed to law-enforcement assessments "about the probability of harm" is not tantamount to

26

providing governmental bodies carte blanche to withhold every shred of information possibly connected to a public-safety situation. *Cox* explains that "vague assertions of risk" alone "will not carry the day" under the exception. 343 S.W.3d at 119. Again, the touchstone is *proof*, which is to say proof *connecting* specific requested information to the threatened harm. *See id.*

### C. *Cox* Shows How The Physical-Safety Exception Ought To Apply.

*Cox* demonstrates how the principles governing the physical-safety exception ought to apply. *Cox* involved requests for disclosure from newspapers seeking information in travel vouchers from the governor's security detail. *Id.* The DPS, which is responsible for the governor's protective detail, offered to release only aggregate expense information derived from the vouchers but warned that releasing the vouchers themselves would "necessarily reveal the number of officers who traveled with the governor and his family, data that would be valuable information for someone who intended to cause the governor harm." *Id.* (internal quotation marks and brackets omitted).

Although the Court remanded the case for application of the newly announced standard governing the exception, it nonetheless instructed

27

that information revealing the number, "specific location," and "identity" of the guards protecting the governor should satisfy the exception. *Id.* at 118-19. This was so, the Court explained, because the information could give a potential and as-yet unidentified person who might be "intent on harming" the governor "the means to accomplish that goal." *Id.* at 118-19. Indeed, with respect to the "number of guards protecting the governor," the Court indicated that the exception in fact was already satisfied. *Id.* at 119 ("To the extent DPS can show . . . that revelation substantially threatens harm—*as it has* with respect to the number of guards protecting the governor—then the information at issue may be withheld." (emphasis added)).

Three aspects of the *Cox* decision bear emphasis.

### 1. *Cox* Shows Courts Should Ordinarily Not Second-Guess Law-Enforcement Threat Assessments.

*Cox* demonstrates the deference owed to a law-enforcement assessment of the probability of harm. Although DPS was a party in that case, the Court nonetheless deferred to DPS's threat assessment. In doing so, the Court: (1) did not demand a full-blown expert opinion from DPS; (2) did not contemplate a "battle of experts" in every case to resolve whether there was a substantial probability that releasing the

28

information might lead to physical harm; (3) did not require evidence of an actual specific, identifiable violent "threat"; (4) did not require evidence that such a threat was likely or that violence was likely, or instruct the district court on remand to demand any such evidence; and (5) did not require evidence of a past incident of violence by a particular person or group. *See id.*

In short, *Cox* teaches that when DPS or other law-enforcement agencies or officials conclude that there is a substantial probability of physical harm associated with releasing requested information, courts should defer to that overall assessment.

### 2. *Cox* Shows Information Should Be Withheld If It Is Connected To The Threatened Harm.

*Cox* teaches that the focus should be on the connection between requested information and the threatened harm. Thus, where the record connected requested information to the DPS's legitimate concern about the governor's safety, the Court did not hesitate to signal that the information should qualify under the exception. For example, information revealing "specific details about the number of officers assigned to protect the governor," "their general location in relation to him," "their dates of travel," "the number of officers . . . necessary for the

29

governor's security," "the specific location . . . where the officers resided," "and the identity of each officer" "may be withheld" because that information could assist a person intent on harming the governor or his family. *Id.* at 118-19.

### 3. *Cox* Also Shows The Limits Of The Exception.

*Cox* also indicates that an assessment of the "probability of harm" does not automatically shield all requested information from disclosure. Rather, each piece of information needs evidence connecting the information to the threatened harm. As the Court explained,

> the dividing line between disclosure and restraint must be determined by proof. To the extent DPS can show, with detailed evidence or expert testimony, that revelation substantially threatens harm—as it has with respect to the number of guards protecting the governor—then the information at issue may be withheld.

*Id.* at 119. Under this reasoning, efforts to withhold "all but the ultimate dollar figure for [the governor's] trips abroad" required more evidentiary support connecting the specific information to the governor's safety. *Id.* Thus, for *all* information about trips abroad to qualify for the exception, the record would need to explain how disclosing each item of information could contribute to the probability of harm to the governor. *See id.*

## II. THE COURT SHOULD REVERSE AND RENDER JUDGMENT BECAUSE THE PHYSICAL-SAFETY EXCEPTION IS SATISFIED AS A MATTER OF LAW.

Under the teachings of *Cox*, the record conclusively establishes that the identity of the compounding pharmacy and its pharmacist qualify for the physical-safety exception as a matter of law. *See City of Garland*, 22 S.W.3d at 356-57; *City of Fort Worth*, 86 S.W.3d at 322. Through *both* detailed evidence *and* expert testimony—although either alone would suffice—TDCJ conclusively satisfied the physical-safety exception as a matter of law. The Court should reverse and render judgement for TDCJ.

### A. The Requested Disclosure Would Substantially Threaten Physical Harm.

TDCJ satisfied the physical-safety exception, as a matter of law, with respect to the identity of the compounding pharmacy. It is important to keep in mind that, unlike the situation in *Cox*, TDCJ does not claim that *all* the requested information is subject to the physical-safety exception. Rather, TDCJ has released all of the requested information with only one exception—information that would identify the compounding pharmacy and its pharmacist. With regard to that *specific* information, detailed evidence, including a DPS threat assessment entitled to deference, reveals that disclosure would substantially

31

threaten physical harm.  Moreover, both the detailed evidence and expert testimony illustrate a clear connection between the requested information and the threatened harm.

1.    **The Humez Email Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information.**

In the weeks prior to the PIA request in this case, the disclosure of the identity of a provider of execution drugs led to troubling and threatening developments in Oklahoma.  This undisputed evidence alone conclusively establishes a substantial threat of physical harm and readily connects the specific information requested for disclosure to the threatened harm.  *See Cox*, 343 S.W.3d at 119.

The undisputed content of Humez's email, and the extent to which federal and state law enforcement took the email seriously, exceeds what is required to demonstrate a substantial threat of physical harm, as a matter of law.  In the email, Humez questioned the "pruden[ce]" of providing the drugs and recommended "beef[ing] up" security "now that you've been put in the spotlight."  CR.590.  "[I]t only takes one fanatic with a truckload of fertilizer," warned Humez.  *Id.*  Even an individual like Humez recognized that providing execution drugs publicly carries a

32

"burden of putting [one's] employees and [oneself] at unacceptable (and possibly uninsurable) risk." *Id.*; *see also* CR.595 (likening bombing a provider of execution drugs to "blowing up an abortion clinic" or "bombing the tracks that led to Auschwitz."). This risk, Humez noted, is "reckless," given the fervor surrounding executions. CR.593. Even the FBI questioned Humez about his email, *see* CR.593-94, and TDCJ Executive Director Livingston considered the email an actual threat, setting aside its propensity to outline and describe an unacceptably threatening environment. *See* CR.558. As *Cox* teaches, an actual explicit threat of violence is not required to find a substantial threat of physical harm. 343 S.W.3d at 119.

The direct connection between the request for information concerning the identity of the pharmacy and the threatened harm is readily established by Humez's email. It was virtually on the heels of the disclosure of the Apothecary Shop's identity that Humez sent his missive. Humez himself confirmed the obvious nexus between the identity of the pharmacy and a threat of physical harm when he recognized that "*now that it [is] generally known that the Apothecary Shoppe was in fact supplying*" the drugs, some people might object and "some of them [the

33

objectors] might be dangerous to them [the pharmacy], their employees, and the surrounding bystanders." CR.593 (emphasis added).

### 2. The "Firestorm" Surrounding The Woodlands Pharmacy Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information.

Additionally, the "firestorm" of hate mail and threats surrounding the disclosure of the identity of the Woodlands Compounding Pharmacy constitutes detailed evidence demonstrating a substantial threat of physical harm that is directly connected to the identity of the pharmacy providing execution drugs. *See* CR.1859 ("Now that the information has been made public, I find myself in the middle of a firestorm."); *see also* CR.581-88; CR.778.

Again, as with the Humez email, whether these emails themselves each constitute actual explicit threats of violence is not the only consideration. The emails' existence and vitriolic character are on-point evidence of a dangerous environment directly connected to the requested information.

### 3. The Exploding-Head Blog Posting Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information.

The October 6, 2013 blog posting further proves a substantial threat of physical harm connected to the identity of the pharmacy. CR.578-79. Almost immediately after the identity of the Woodlands Pharmacy was revealed, the posting appeared, including its picture of the pharmacist's head exploding and caption entitled, "Meet the pharmacist who sold the medical ethics [sic] and shamed his profession for $2,800, **Mr. Jasper Lovoi, RPh**." CR.578 (emphasis in original). Again, as with the emails, whether the blog posting itself is an actual explicit threat of violence is not the only, or even the controlling, consideration.

### 4. Law Enforcement's Reaction To The Woodlands Pharmacy "Firestorm" Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information.

Next comes law enforcement's reaction to the Woodlands Pharmacy situation, and it too is detailed evidence of a substantial threat of physical harm connected to the pharmacy's identity. The "firestorm" surrounding the disclosure of the Woodlands Pharmacy's identity posed a sufficiently serious threat of harm to prompt the TDCJ Office of the Inspector General and the Montgomery County Sheriff's office to dispatch officers

35

to observe and provide security at a protest of the pharmacy. *See* CR.564; CR.729. The connection between the identity of the pharmacy and a potential security risk warranting a law-enforcement presence is again obvious: the protest was held at the pharmacy because its identity was disclosed to the public.

### 5. Brad Livingston's Testimony Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information.

The determination of TDCJ Executive Director Brad Livingston— *before* any PIA request for disclosure was ever submitted—that he needed to take the necessary steps to ensure the identity of the pharmacy remained confidential is further proof of a substantial threat of harm. Livingston based his determination on "threats of harm" that have "certainly escalated in degree and type" in recent times, not vague assertions of risk. CR.559. Specifically, he cited the "graphic example on the Internet, dated October 6, 2013, [which] shows a graphic of the screaming and violently exploding head of the [Woodland compounding Pharmacy] pharmacists who [previously] supplied TDCJ with lethal injection chemicals." *Id.* He also referenced the Humez email, which he described as "a very recent threat to a pharmacist and their pharmacy

wherein it was threatened to place a truck filled with fertilizer in front of the pharmacy and blow it up." CR.558.

Livingston summed up his assessment of the threat environment and its immediate connection to the identity of the compounding pharmacy when he explained why he sought a threat assessment from McCraw. To begin, he recognized, based on his own expertise, that the threat environment was "serious." CR. 1343. He also noted a clear nexus between the disclosure of the identity of a pharmacy supplying execution drugs and threats to the pharmacy:

> [T]here is an immediate, in my view, nexus between when a compounding pharmacy is made public and the immediacy or nearly immediacy of the harassing E-mails and threats – it happened both in this case and in January of 2014 with respect to The Apothecary Shop in Oklahoma. The day after it was reported that they were the likely supplier of compounded drugs to the Department of Corrections in Missouri, a very significant and real threat -- threatening E-mail was sent.

CR.1343-44. In addition to concerns specific to execution drugs and the identity of the supplying pharmacy, Livingston further noted the nature of the larger criminal-justice environment within which he, and any supplier of execution drugs, must operate:

> [T]hat spring of 2014 was a very unsettled and dangerous world. The context included security risks that are inherent

37

in -- in the criminal justice world that had escalated in general and specifically over the last number of months . . . . [W]e're just roughly a year removed from the director of the Colorado Department of Corrections being assassinated on March the 19th . . . . At that same time there were specific death threats to me, both just prior to the Executive Director in Colorado's assassination and just shortly after it.

CR.1344-45.

### 6. McCraw's Threat Assessment Is Detailed Evidence Of A Substantial Threat Of Harm That Is Connected To The Requested Information And Is Entitled To Deference.

In response to Livingston's concerns, TDCJ obtained and provided the OAG and the district court with a threat assessment from Director of DPS McCraw. Under *Cox*, McCraw's assessment of the "probability of harm" is entitled to deference, so long as it is not a "vague assertion[] of risk." *Cox*, 343 S.W.3d at 119.

McCraw's assessment is anything but a vague assertion. McCraw conducted the assessment based on the documents and evidence just described, as well as open source information and his own expertise, training, and skill in law enforcement. *See* CR.634 (noting that his assessment was based on his "training and experience received throughout my law enforcement career, including my training and experience of conducting threat assessments for the Attorney General of

38

the United States and the director of the FBI."); CR.635-36. Although McCraw is not a party to this litigation and has no interest in its outcome, he was nonetheless generally familiar with the issues at the time Livingston requested a threat assessment from him. CR.634.

McCraw connected the specific evidence he considered with his ultimate conclusion about the threat environment. He also connected his threat assessment to the identity of the compounding pharmacy currently at issue. He explained that he reviewed and based his assessment on, "among other things," "an email threat to the apothecary shop in Oklahoma when it was revealed as a supplier of execution drugs" as well as email and blog posts setting out "excoriating criticisms of the Woodlands Pharmacy and Mr. Lovoi after TDCJ revealed the identity of the supplier of execution drug in 2013." CR.635; CR.686-87. McCraw's methodology "consider[ed] the product of vulnerability, probability, and consequences to determine the severity of a threat." *Id.*

McCraw specifically explained how his assessment was informed by the underlying evidence of threatened violence surrounding prior disclosures of the identity of execution-drug suppliers. Regarding the Humez email, McCraw explained:

> I considered the email from Professor Humez to the Oklahoma pharmacy . . . to constitute a serious threat. The email is indicative of the fervor surrounding the death penalty issue that, in my opinion, may likely lead to violence against the compounding pharmacy if the identity is released.

CR.635. Similarly, "the other emails" in the record that he considered, although they "did not contain direct threats" of violence in and of themselves nonetheless "demonstrate the tension and attention surrounding the provision of execution drugs to TDCJ, which is likely to lead to violence against the compounding pharmacy if the identity is disclosed." CR.636. Given all this detailed evidence, McCraw's assessment of a threat based on it is anything but a "vague assertion[]" *Cox*, 343 S.W.3d at 119.

McCraw's assessment of the pharmacy's high vulnerability is similarly supported by specific details, and it also is no vague assertion. He based the assessment on the fact that "the current compounding pharmacy is open to the public and located in an urban area of a Texas city." CR.635. He noted that when researching the Woodlands Pharmacy, he was able to "locate the pharmacy's website and then from open source information I could easily identify and locate the pharmacy's employees and their family members." *Id*. Moreover, public

40

"[p]harmacies are by design easily accessible to the public." *Id.* Thus, "[a]ny pharmacy that is located in a city and open to the public is easily accessible and presents a 'soft-target,' meaning it is an easy target for violence, and generally unprotected by significant security measures." *Id.* "The threat extends beyond those inside the pharmacy itself, because violence that occurs near the pharmacy can injure bystanders as well." *Id.*

Before reaching his conclusion, McCraw also considered "other acts of violence" as well as the conduct of "radical fanatics, such as opponents to abortion and animal testing." CR.636. Ultimately, McCraw concluded:

> If the supplier is identified, there is a substantial (or significant) threat of physical harm to the pharmacist, employees, customers, or bystanders. Issues of passion, including the death penalty, inherently pose a significant risk of escalation to violence. Moreover, not all acts of violence are preceded by threats. For example, the murder of the district attorney in Kaufman County was not preceded by a known threat. It will be difficult, if not impossible, to stop violence against a supplier if the person seeking to cause harm does not put the supplier on notice prior to an attack.
>
> ***
>
> It is my opinion, based on my law enforcement training and experience, as well as the documents, materials, and conversations in this case, that there is absolutely a

41

substantial threat of physical harm that would result from the release of the name of the supplier of the execution drug.

*Id.*

In sum, detailed evidence conclusively establishes as a matter of law that there is a substantial threat of physical harm in connection with the possible release of information identifying the pharmacy and pharmacist providing execution drugs to Texas.

### B. The Assessments Provided By TDCJ's Experts Independently Establish The Exception As A Matter Of Law.

Although TDCJ was not required to provide a law-enforcement-expert opinion, it nonetheless provided *two* such opinions. *See Cox*, 343 S.W.3d at 119 (exception may be established by "detailed evidence or expert testimony"). TDCJ offered the deposition and affidavit testimony of a retained expert, Cunningham, as well as the already discussed deposition and affidavit testimony of an unretained nonparty expert, McCraw. Both opinions are entitled to deference with regard to their assessment of the probability of harm, and they independently (and in combination) confirm that the requested information should not be disclosed because the physical-safety exception is satisfied as a matter of law.

It is difficult to imagine expert witnesses more qualified to testify on threat assessments than Cunningham and McCraw. Cunningham has spent the vast majority of his 40-year professional career performing threat assessments and teaching others how to perform them. *See* pp. 15-18 *supra.* McCraw, likewise, has extensive relevant experience, including (among other things) 21 years in the FBI as well as service as Director of Homeland Security in Texas and as Director of the Foreign Terrorism Tracking Task Force, where he reported directly to Deputy Attorney General Larry Thompson at the Department of Justice and oversaw two threat assessments requested by the U.S. Attorney General. CR.633; *see* pp. 8-11 *supra.*

### 1. McCraw's Opinion Demonstrates A Substantial Threat Of Physical Harm.

TDCJ offered an expert threat assessment from DPS's Director, Col. McCraw. As discussed above, McCraw's assessment of the probability of harm is entitled to deference under *Cox. See* Part II.A.6 *supra.* Moreover, as also discussed at length above, the probability of harm identified by McCraw (and Livingston and, later, Cunningham) is connected by detailed, specific evidence to the information that has been requested here, namely the identity of the compounding pharmacy. *See*

43

Part II.A.1-6. McCraw's opinion is "clear, positive, and direct," is "credible and free from contradictions and inconsistencies," and therefore constitutes valid summary-judgment evidence that conclusively establishes TDCJ's entitlement to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *see Anderson*, 808 S.W.2d at 55.

### 2. Cunningham's Opinion Demonstrates A Substantial Threat Of Physical Harm.

Cunningham, a qualified expert on threat assessments with extensive current assessment training and experience, conducted an extensive threat assessment and concluded that there is a substantial threat of physical harm. Cunningham based his opinion on (1) the documents provided to McCraw, (2) his own substantial experience and background as a law-enforcement expert, and (3) his own independent research. CR.567-74.

Cunningham examined a number of factors in developing his opinion. CR.625-26. First, he referred to an increase in violent crime in the U.S. between 2011 and 2012, including shootings and bombings, and an increase in the number of terror cells in the U.S.. *See* CR.668-69, 625. This information, he explained, was derived from the FBI's database, accessible via its website, which reflects a ".7 percent increase [in] violent

crime in the United States from 2011 to 2012." CR.669; *see* Crime in the United States 2012, at http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/violent-crime/ violent-crime (last visited June 4, 2015). Cunningham also referred to the "Alcohol Tobacco and Firearms . . . database," which "shows that there were 5900 bombing incidents domestically this past year, 2013, up 300, approximately, from 2012." CR.669. He also relied on his own "research in developing two courses which I teach for Homeland Security, NCBRT, prevention and deterrence of terrorism," in which "we talk about trends of terrorism and violent acts domestically and internationally." *Id*. He further relied on his "work as a primary author on [a] campus emergencies course . . . where we talk about tracking violence on [college] campuses." *Id*.

Cunningham also referred to the sociopolitical climate surrounding certain policy issues that invoke great passion, like abortion, and he addressed the amount of violence related to and directed at abortion clinics, abortion doctors, and businesses and universities involved in animal research. CR.660, 673-77, 681. Cunningham provided statistics documenting violence against abortion clinics during the past 38 years:

> I will tell you that in -- from '77 to 2013, there were eight murders, 17 attempted murders national -- nationwide, 181

45

arsons, 42 bombings, 1,495 vandalisms, 2482 trespassing, a hundred acid attacks, 428 death threats, 15,934 hate mails or harassing calls, 170,710 picketing, 616 -- 61 [sic] bomb threats, and clinic blockades. Now, of that, 33,839 arrests were made.

CR.676. And he explained that pro-life and animal-rights groups are the best available comparator group for violence that would be targeted against death-penalty participants. *See id.*

Next, Cunningham referred to the volatility and overall risk of (outside-prison) violence surrounding prison issues generally and the death penalty specifically. *See* CR.683. He also referred to something called "the contagion effect," which results from Internet communications causing dramatically increased interest in a topic, as with the increased interest in the execution process after problematic executions in Arizona and Oklahoma. *See* CR.656-57, 659-60, 662, 674-75, 682. The contagion effect is also consistent with the Internet providing greater access to methods and materials by which people can carry out violence, as well as a means to recruit members to radical groups. CR.675.

Cunningham explained that there is a dearth of data regarding violence against compounding pharmacies typically stop producing execution drugs after being publicly identified as a supplier. He also

46

noted, however, that such withdrawal from the market could actually result in an increased risk to the remaining targets.  CR.676-77.

He also discussed the difficulty associated with predicting who will perpetrate violence in these types of situations because those who perpetrate such violence often give no prior warning and make no prior threats.  CR.655-56, 659; *see also* CR.567, 626.  Lastly, Cunningham noted the difficulties in preventing violence against a highly accessible target like a compounding pharmacy or its pharmacist, employees, or bystanders.  *See* CR.626.

> Based on these factors, and others, Cunningham concluded:
>
> I conclude that there is a significant and substantial threat of physical harm to the pharmacy/compounding pharmacy and pharmacist, and others in the vicinity of the pharmacy/compounding pharmacy if the identity of the pharmacy/compounding pharmacy or pharmacist is publicly disclosed.

CR.625.

## C. Plaintiffs' Arguments Below Misunderstood The Governing Standards.

Plaintiffs challenged the testimony of McCraw and Cunningham with their own expert, Parker, who essentially opined that McCraw and Cunningham offered only "basic and unsupported fear-mongering

47

without any basis" and, ultimately, resorted to nothing more than "buzzwords" reflecting "inchoate, pie-in-the-sky concerns." CR.732; *see id.* ("All of TDCJ's arguments are basic and unsupported fear-mongering without any basis to establish a substantial threat of physical harm."); CR.1918.

### 1. Plaintiffs' Arguments Below Assumed An Incorrect Legal Standard.

To start, Plaintiffs arguments below were largely founded on incorrect formulations of the *Cox* standard that improperly heightened TDCJ's burden. Small distinctions in framing the legal standard are "very important," as Plaintiffs themselves have argued, CR.731. Plaintiffs' improper presentation of the *Cox* standard to the district court undermines the court's ruling.

For example, Plaintiffs erroneously argued below that TDCJ was required to show a "high degree of certainty . . . that a substantial threat of physical harm will occur if the information is disclosed." CR.732. *Cox* reflects no such high-degree-of-certainty requirement. Indeed, *Cox* declined to adopt a standard requiring "a reasonably perceived likely threat." *Cox*, 343 S.W.3d at 118 (noting that the standard adopted was "close, but not identical," to the rejected standard). Likewise, Plaintiffs

improperly argued that a Livingston's testimony should not be credited because it supposedly "did not suggest that violence was *likely*." CR.743 (emphasis added).

Even more off the mark were Plaintiffs' prominent—and legally erroneous—arguments framing the relevant legal standard in terms of a failure to point to a specific past instance of "**violence** against a Lethal Injection Drug provider," CR.731 (emphasis in original). *See id.* (arguing that "there has never been any actual violence (or threat of violence) against any Lethal Injection drug provider" "[w]hen TDCJ previously . . . let it be known who supplied them with lethal injection drugs"). As discussed above, *see* Part I.C.1 *supra*, *Cox* and the PIA do not require specific past incidents of violence to justify withholding information that substantially threatens physical harm, and it would be dangerous to impose such a *per se* requirement.

Perhaps most egregious were Plaintiffs arguments that a specific, concrete threat of violence is needed to establish that disclosure would substantially threaten physical harm. *See* CR.731 (arguing that TDCJ did not identify "any direct and actual **threat of violence** (even though not carried out) to any provider of Lethal Injection Drugs in Texas")

49

(emphasis in original).  *Cox* refutes this view of the physical-safety exception as well.  *See Cox*, 343 S.W.3d at 119.

### 2. Plaintiffs' Efforts To Create A Battle Of Experts On An Issue With Immediate Public-Safety Implications Is Misguided.

Plaintiffs' attempts to set their expert Parker against Director of TDCJ McCraw and Cunningham for purposes of determining the "probability of harm" reflect a similar misunderstanding of the governing legal standards and, therefore, should be rejected.  *Cox*, 343 S.W.3d at 119.  *Cox* anticipates deference to a law-enforcement assessment of the "probability of harm"; it does not countenance "a battle of experts" where the legal standards governing expert opinions are the lynchpin for determining whether and to what extent there is a substantial public-safety threat.  *Id.*

This case is the first opportunity for a court of appeals to apply the standards announced in *Cox*.  At stake are issues that extend far beyond death-penalty litigation or the identity of Texas's provider of execution drugs.  The physical-safety exception will be invoked in future cases in which it is believed that disclosure of requested information from a governmental body will result in a substantial threat of physical harm.

50

As *Cox* makes clear, a DPS or other law-enforcement expert's assessment that there is an unacceptably high "probability of harm" should receive deference; it should not be the target of arguments traditionally reserved for situations in which no special solicitude is afforded an expert's opinion.

Further, even assuming McCraw's and Cunningham's opinions are properly subjected to a full-blown expert analysis or are properly part of a "battle of the experts," the opinions readily survive any such attacks, for all the reasons discussed above and immediately below.

### D. Plaintiffs' Expert's Testimony Should Not Have Been Considered And, In Any Event, Could Not Undermine TDCJ's Experts' Testimony.

Plaintiffs' expert Parker's testimony should not have been considered by the district court and, in any event, could not undermine the testimony of TDCJ's experts. "An expert witness may testify regarding matters of scientific, technical, or other specialized matters only if (1) the expert is qualified, (2) the probative value of the testimony is not outweighed by the prejudice, and (3) the expert's opinion is relevant and based on a reliable foundation." *See* TEX. R. EVID. 401-03, 702;

51

*Transcon. Ins. Co. v. Crump*, 330 S.W.3d 211, 215 (Tex. 2010); *see E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995).

### 1.    Parker Is Not Qualified.

An expert witness must be qualified to give an opinion by knowledge, skill, experience, training, or education.  *See* TEX. R. EVID. 702; *Broders v. Heise*, 924 S.W.2d 148, 153-54 (Tex. 1996).  Parker is not qualified to give an expert opinion on the probability of harm in this case because he has no recent law-enforcement training.

Parker has been retired from the FBI since 1994 and has no other relevant, recent law-enforcement or threat-assessment experience. Parker agreed that the world has changed dramatically since 1994. CR.963, 2231.  This case involves current threats and relates to an environment that developed within the last one to two years.  *See* CR.704-05 (describing relevant recent developments in the threat environment). Parker's most recent training was six or seven years ago.  CR.2220-21. He no longer holds any security clearance or police license, other than a private-investigator license.    CR.2250. His last certification as a California police officer was 40 years ago.  CR.2188.  His current business

is exclusively serving as a hired expert witness to opine on "police practices." CR.2191-92.

Despite his lack of any recent training or experience, Parker did not crack a book when formulating his opinion about whether a threat could be determined based on the documents with which he was provided. CR.2193. He did not conduct any outside research, CR.2185, and only reviewed protocols or threat assessment "a couple of years ago" in a source that he does not remember. CR.2217-19.

In sum, Parker (1) has had no apparent law enforcement training in over 20 years, (2) did not conduct a threat assessment in connection with this case, (3) did not look at any books or consult other experts, and (4) has not taught any courses on threat assessment. Accordingly, he is not qualified to serve as an expert witness on threat assessment in this case.

### 2. Parker's Opinion Does Not Have A Sufficient Basis And Is Unreliable.

Expert testimony must be based on sufficient underlying facts or data, as required by Texas Rules of Evidence 702 and 703. *See Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 714 (Tex. 1997). The

testimony must also be reliable. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637 (Tex. 2009); *Robinson,* 923 S.W.2d at 557.

Parker's opinion lacks sufficient basis and is unreliable because he considered only whether there had been relevant past violent acts against a pharmacy or prison. He thus refused to consider other, relevant past violent acts, including the recent assassination of the Director of the Colorado prison system, death threats against the Director of the Texas prisons, violent acts carried out against abortion clinics and their physicians, and violent acts against universities, businesses, and personnel involved in animal research. *See* CR.2245-49, 2258. At the same time, however, Parker conceded that the absence of a violent act does not mean that one will not or cannot occur, CR.2258-59, and that there are many people opposed to the death penalty, CR.2253.

Parker's opinions are also unreliable because he was not engaged in the appropriate inquiry and is biased. Assuming Parker is qualified as a law-enforcement expert, the appropriate inquiry for such an expert in these circumstances is to opine on the probability of harm. *See Cox,* 343 S.W.3d at 119. Parker's treatment of the Humez email provides an example of his misguided inquiry. Parker concluded that the email was

54

not itself a threat and that Humez was merely "expressing his concerns and, as a concerned citizen, cautioning them [the pharmacy in Oklahoma] to be aware that there are 'fanatic' individuals around who are capable of duplicating the Oklahoma City Federal building bombing."  CR.793-94. But whether the email is a threat in and of itself does not answer the question at hand, which is not whether there is or was an existing threat but whether the *probability of harm* is unacceptably high.  *Cox*, 343 S.W.3d at 119.  Parker obstinately refused to consider whether the email reflects an unacceptable level of possible danger, whether or not the email itself is actually a threat to blow up a pharmacy with a fertilizer bomb.

Moreover, Parker justified his conclusions on factors that cannot supply a reliable answer to the question of the probability of harm.  For example, Parker based his conclusions on the following:

- no "direct threats against any pharmacies or individuals connected to them," CR.790,

- no "readily identifiable targeted threats," *id.*,

- "communications . . . expressing opinions" that "do not appear to contain any specific threat of violence," CR.792,

- the exploding-head blog has no "*wording* which could even be loosely interpreted as threatening," CR.792 (emphasis added),

55

- that it was "unlikely that [Humez] intended to commit any violence *himself*," CR.793 (emphasis added),

- that according to the author of the exploding-head blog, "there was nothing violent about this at all," CR.794, and

- "all TDCJ has presented are [ ] vague assertions of risk, especially since there have been no documented cases of violence involving such pharmacies," CR.805.

*Cox* instructs that specific, identifiable threats are not necessary to determine that there is an unacceptably high probability of harm. 343 S.W.3d at 119.

Finally, Parker is biased. He sits on the Board of Directors of Death Penalty Focus, and organization whose goal is to abolish the death penalty. CR.2252. But Plaintiffs' September 5, 2014, witness disclosure provides that Parker is not biased for purposes of serving as an expert in this case. CR.2289. Moreover, Parker's CV does not disclose his membership in Death Penalty Focus, and he only disclosed it near the end of his six-hour deposition after repeatedly dodging questions about his membership in organizations. *See* CR.2162-63. Parker eventually conceded, "I am biased against the death penalty." CR.2252. Parker's admitted bias against the death penalty renders his opinions unworthy of any credence.

56

**III. IN THE ALTERNATIVE AND AT THE VERY LEAST, THE COURT SHOULD REMAND BECAUSE PLAINTIFFS CANNOT SHOW ENTITLEMENT TO JUDGMENT AS A MATTER OF LAW.**

Even if the Court were to determine that TDCJ is not entitled to summary judgment, the grant of summary judgment for Plaintiffs must nonetheless be reversed and the case remanded for trial on the merits. Barring a grant of judgment for TDCJ, there would remain (at the very least) a genuine issue of material fact regarding Plaintiffs' entitlement to summary judgement.

A district court, for example, should not resolve at the summary judgment stage issues of witness creditability or the weight to afford testimony; those issues are reserved for a trial on the merits, whether the factfinder at trial is a judge or a jury. *See* 7 WILLIAM DORSANEO III, TEXAS LITIGATION GUIDE §101.07[3][a] (2014) (noting that expert testimony that falls short of qualifying under TEX. R. CIV. P. 166a(c) "does no more than raise an issue of fact"); *see also* ALEX WILSON ALBRIGHT, TEXAS COURTS A SURVEY 461 (Imprimatur Press) (2010-2011).

To the extent there is a fact question concerning whether there is a substantial risk that releasing the requested information would lead to violence, a trial on the merits is needed. Because Plaintiffs, at most,

could only raise a genuine issue of disputed fact regarding the applicability of the physical-safety exception (assuming *arguendo* they have refuted TDCJ's entitlement to judgment as a matter of law), the portion of the order granting Plaintiffs' summary-judgment motion must be reversed and the case remanded for trial.

## PRAYER

For these reasons, the Court should reverse the district court and render judgment for TDCJ or, in the alternative, remand the case for trial on the merits.

Respectfully submitted.

Dated: June 8, 2015

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney General

SCOTT KELLER

/s/ Richard B. Farrer
RICHARD B. FARRER
Assistant Solicitor General
State Bar No. 24069702

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-2923
Fax: (512) 474-2697
richard.farrer@texasattorneygeneral.gov

COUNSEL FOR APPELLANT

**CERTIFICATE OF SERVICE**

I hereby certify that on this the 8th day of June, 2015, a true and

correct copy of the foregoing document was served via File & ServeXpress

to all counsel of record.

Philip Durst
Manuel Quinto-Pozos
DEATS, DURST, OWEN & LEVY, P.L.L.C.
1204 San Antonio, Ste. 203
Austin, TX 78701
Telephone: (512) 4 7 4-6200
Facsimile: (512) 474-7896
pdurst@ddollaw.com
mqp@ddollaw.com

Maurie Amanda Levin
ATTORNEY AT LAW
211 South St., #346
Philadelphia, PA 19147
Telephone: (512) 294-1540
Facsimile: (215) 733-9225
maurielevin@gmail.com

/s/  Richard B. Farrer
Assistant Solicitor General

## CERTIFICATE OF COMPLIANCE

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this brief contains 11,158 words, excluding the portions of the brief exempted by Rule 9.4(i)(1).

/s/ Richard B. Farrer
Assistant Solicitor General

# APPENDIX

# APPENDIX TABLE OF CONTENTS

Order on Plaintiffs' Motion for Summary Judgment and
  Defendants' Motion for Summary Judgment ........................................................A

*Texas Dep't of Public Safety v. Cox Texas Newspapers, L.P., and*
  *Hearst Newspapers, L.L.C.,*
  343 S.W.3D 112, 39 MEDIA L. REP. 2267, 54 TEX. SUP. CT. J. 1428 ......................... B



CAUSE NO. D-1-GN-14-000908

| | | |
|---|---|---|
| MAURIE LEVIN, NAOMI TERR, and, HILARY SHEARD, <br> Plaintiffs | § § § § | IN THE DISTRICT COURT OF |
| VS. | § § § | |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, <br> Defendant | § § § § | TRAVIS COUNTY, TEXAS <br><br> 201ST JUDICIAL DISTRICT |

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Came on for consideration at a hearing on December 3, 2014, Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. Plaintiffs and Defendant appeared at the hearing through their respective counsel. After considering the arguments made at the hearing on December 3, 2014, the relevant pleadings on file, the summary judgment evidence tendered to the Court at the time of the hearing, and the Court's separate rulings on Plaintiffs' and Defendant's Objections to and Motions to Strike Summary Judgment Evidence and Defendant's Motion to Strike Plaintiffs' Expert, Thomas Parker, the Court now finds that Plaintiffs' Motion for Partial Summary Judgment should be granted and Defendant's Motion for Summary Judgment should be denied.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Plaintiffs' Motion for Partial Summary Judgment is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant's Motion for Summary Judgment is DENIED.

SIGNED on the 11 day of DECEMBER, 2014.

DARLENE BYRNE
JUDGE PRESIDING

2312

B

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**



Supreme Court of Texas.
TEXAS DEPARTMENT OF PUBLIC SAFETY,
Petitioner,
v.
COX TEXAS NEWSPAPERS, L.P., and Hearst
Newspapers, L.L.C., Respondents.

No. 09–0530.
Argued Sept. 15, 2010.
Decided July 1, 2011.

**Background:** Newspapers brought action under Texas Public Information Act (PIA) against Department of Public Safety (DPS), seeking writ of mandamus to compel the disclosure of expense vouchers relating to Governor's travel. After a bench trial, the 261st Judicial District Court, Travis County, Scott H. Jenkins, J., granted the writ. Department appealed, and the Court of Appeals, 287 S.W.3d 390, affirmed. The DPS petitioned for review.

**Holding:** Upon granting review, the Supreme Court, Jefferson, C.J., held that remand was necessary to determine if revelation of requested documents substantially threatened physical harm.

Reversed and remanded.

Wainwright, J., filed opinion concurring in the judgment joined by Johnson, J.

West Headnotes

**[1] Records 326 31**

326 Records

326II Public Access
326II(A) In General
326k31 k. Regulations limiting access; offenses. Most Cited Cases

A law does not have to use the word "confidential" to expressly impose confidentiality.

**[2] Constitutional Law 92 2471**

92 Constitutional Law
92XX Separation of Powers
92XX(C) Judicial Powers and Functions
92XX(C)2 Encroachment on Legislature
92k2471 k. Modification of common law. Most Cited Cases

While the Supreme Court is not bound by the Legislature's policy decisions when it considers protections afforded by the common law, the boundaries the Legislature has drawn do inform its decision.

**[3] Records 326 63**

326 Records
326II Public Access
326II(B) General Statutory Disclosure Requirements
326k61 Proceedings for Disclosure
326k63 k. Judicial enforcement in general. Most Cited Cases

Remand was necessary in action by newspapers seeking disclosure of expense vouchers relating to Governor's travel under the Texas Public Information Act (PIA) to determine if revelation of requested documents substantially threatened physical harm; PIA protected from disclosure information that substantially threatened physical harm. V.T.C.A., Gov-

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

ernment Code § 552.101.

**[4] Records 326 🗝54**

326 Records
    326II Public Access
        326II(B) General Statutory Disclosure Requirements
           326k53 Matters Subject to Disclosure; Exemptions
              326k54 k. In general. Most Cited Cases

Common law protects individuals from physical harm, and, consistent with the Texas Public Information Act (PIA), that protection extends to the disclosure of information that substantially threatens such harm. V.T.C.A., Government Code § 552.101.

**\*112** Michael P. Murphy, Asst. Solicitor General, James C. Ho, Gibson Dunn & Crutcher LLP, Dallas, David S. Morales, Office of the Attorney General of Texas, Deputy First Assistant Attorney General, Attorney General Greg W. Abbott, Attorney General of Texas, Peter Carl Hansen, Office of the Attorney General, Bill Davis, Office of the Attorney General of Texas, Office of Solicitor General, Barbara Bryant Deane, Assistant Attorney General, Brenda Loudermilk, Office of the Attorney General of Texas, Matthew T. Bohuslav, Office of the Attorney General, for Texas Department of Public Safety.

William Gerow Christian, Graves Dougherty Hearon & Moody, PC, Austin, for Cox Texas Newspapers, L.P.

Joseph R. Larsen, Sedgwick, Detert, Moran & Arnold, LLP, Houston, for Amicus Curiae Freedom of Information Foundation of Texas.

**\*113** Chief Justice JEFFERSON delivered the opinion of the Court, joined by Justice HECHT, Justice GREEN, Justice GUZMAN, and Justice LEHR-MANN.

Our common law protects from public disclosure highly intimate or embarrassing facts. We must decide whether it also protects information that substantially threatens physical harm. We conclude that it does. Both sides raise important questions, not just about safety but also about the public's right to know how the government spends taxpayer money. Those issues could not have been fully litigated under the standard that prevailed before today's decision. Accordingly, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

**I. Background**

In separate requests, two reporters representing three newspapers asked the Department of Public Safety for travel vouchers from Governor Rick Perry's security detail. One request was limited to the Governor's out-of-state trips in 2001 and 2007; the other was not confined to a specific period of travel. Believing all of the documents to be excepted from disclosure under the Public Information Act (specifically Government Code section 552.101), DPS sought a ruling from the Attorney General's office.

DPS noted that it is responsible for staffing the governor's protective detail and that it does not publicly discuss security practices or the identity or numbers of officers so assigned. DPS offered to release aggregated expense information, warning that releasing the vouchers themselves would "necessarily reveal the number of officers who traveled with the governor and his family," data that "would be valuable information for someone who intended to cause [the governor] harm."

Based solely on DPS's letter and inspection of a subset of the responsive documents, the Attorney General determined that release of the information would place the governor in imminent threat of physical danger. Accordingly, the Attorney General concluded that the information fell within a "special circumstances" aspect of common law privacy that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

required DPS to withhold the submitted information in its entirety under Government Code section 552.101. FN1 Cox and Hearst, publishers of the newspapers in question, sued DPS, seeking a writ of mandamus to compel complete disclosure. *See* TEX. GOV'T CODE § 552.321(a). After a bench trial, the trial court found that public disclosure of the information in the vouchers would not put any person in imminent threat of physical danger or create a substantial risk of serious bodily harm from a reasonably perceived likely threat. The trial court ordered the clerk to issue a writ of mandamus compelling DPS to produce the vouchers in their entirety.

> FN1. Twice before, the Attorney General ruled that similar vouchers had to be disclosed. *See* Tex. Att'y Gen. OR2004–4723; Tex. Att'y Gen. OR2002–0605. In those instances, however, the only exception DPS urged was Government Code section 552.108, which protects certain law enforcement information. *See* TEX. GOV'T CODE § 552.108. Because he believed that exception to be discretionary, however, the Attorney General ruled that it could not be considered in conjunction with section 552.022. *See id.* § 552.022 (making certain information in vouchers public unless expressly confidential under "other law"). DPS did not appeal either of those rulings.

The court of appeals affirmed. 287 S.W.3d 390, 398. It held that the Attorney General's "special circumstances" exception conflicted with *Industrial Foundation of the South v. Texas Industrial Accident Board,* 540 S.W.2d 668, 685 (Tex.1976). **\*114** *Id.* at 394. According to the court of appeals, *Industrial Foundation* "declared its two-part test to be the 'sole criteria' for the disclosure of information to be deemed a wrongful publication of private information under common law." *Id.* (quoting *Industrial Foundation,* 540 S.W.2d at 686). Because DPS conceded that the first prong of that test (that the information contains

highly intimate or embarrassing facts) had not been satisfied, the court held that the vouchers could not be withheld based on the common law right of privacy. *Id.* at 395. The court also rejected DPS's claim that the Fourteenth Amendment to the United States Constitution barred disclosure of information that would create a substantial risk of serious bodily harm from a perceived likely threat. *Id.* at 398. The court observed that "[w]hether the privacy interests at issue here *should* merit protection under the PIA is a question for the legislature." *Id.*

We granted the petition for review to examine whether the public's right to information is subject to reasonable limitations when its production may lead to physical harm.FN2 53 Tex. Sup.Ct. J. 1023 (Aug. 20, 2010). DPS asserts that the vouchers are confidential under the common law and under Government Code section 418.176(a)(2).FN3 We address each argument in turn.

> FN2. The Freedom of Information Foundation of Texas submitted an amicus curiae brief in support of Cox and Hearst.

> FN3. DPS no longer makes an argument based on a constitutional right of privacy.

## II. Does "other law" include a common law right to be free from physical harm?

[1] The PIA guarantees access to public information, subject to certain exceptions. *See generally* TEX. GOV'T CODE ch. 552. Those exceptions embrace the understanding that the public's right to know is tempered by the individual and other interests at stake in disclosing that information. *See generally* TEX. GOV'T CODE ch. 552, subch. C. In 1999, the Legislature excluded certain categories of public information from the exceptions. *See id.* § 552.022. This core public information is currently FN4 protected from disclosure only if it is " 'expressly confidential *under other law,*' meaning law other than Chapter 552 of the

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

Government Code, which is the Public Information Act." *In re City of Georgetown,* 53 S.W.3d 328, 331 (Tex.2001) (quoting TEX. GOV'T CODE § 552.022(a)). "Other law" includes other statutes, judicial decisions, and rules promulgated by the judiciary. *Id.* at 332. "A law does not have to use the word 'confidential' to expressly impose confidentiality." *Id.* at 334.

> FN4. The Legislature has since amended section 552.022(a). Effective September 1, 2011, core public information may be withheld if it is confidential under either the PIA or other law. *See* Act of May 30, 2011, 82nd Leg., R.S., S.B. 602, § 2 (to be codified at TEX. GOV'T CODE § 552.022(a)).

The parties agree that the vouchers contain core public information.FN5 *See* TEX. GOV'T CODE § 552.022(a)(3) (including "information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body"). For this reason, that information is presently unaffected by the Legislature's passage, five days after the court of appeals' decision, of an amendment excepting public information from disclosure "if, under the specific circumstances pertaining to the [government] employee or officer, disclosure of the information would subject the employee or officer to a substantial**\*115** threat of physical harm." Act of June 3, 2009, 81st Leg., R.S., ch. 283, § 4, 2009 Tex. Gen. Laws 742 (codified at TEX. GOV'T CODE § 552.151). Because this exception is in the PIA, it does not currently apply to core public information.FN6 TEX. GOV'T CODE § 552.022(a).

> FN5. The parties do not address, and we do not decide, what voucher information is "core" and what is not.

> FN6. The Legislature recently passed (although the Governor has not yet acted on) an amendment making vouchers confidential, but that amendment would not apply to the vouchers at issue in this case. Act introduced May 31, 2011, 82nd Leg., 1st C. S., S.B. 1, art. 79A (to be codified at TEX. GOV'T CODE ch. 660).

We turn, then, to DPS's argument that "other law" includes a common law right to be free from physical harm. DPS urges an exception for cases in which there is an imminent threat of physical danger. DPS asserts that if the common law protects personal privacy, it must logically protect physical safety as well. Ensuring the physical safety of its citizens, says DPS, is the "primary concern of every government," FN7 and preventing disclosure that would threaten physical safety is deeply rooted in the common law. *See, e.g., Fisher v. Carrousel Motor Hotel, Inc.,* 424 S.W.2d 627, 629 (Tex.1967) (observing that " '[t]he interest in freedom from intentional and unpermitted contacts with the plaintiff's person is protected by an action for the tort commonly called battery' " (quoting WILLIAM L. PROSSER, LAW OF TORTS 32 (3d ed.1964))).

> FN7. *United States v. Salerno,* 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987).

Freedom from physical harm is indeed a hallmark of our common law. One of our earliest reported cases involving battery was decided by the Supreme Court of the Republic of Texas. Eli Williams sued Jesse Benton for assault and battery. *Benton v. Williams,* Dallam 496, 496 (Tex.1843). Benton filed a plea asserting that he should not have to answer the complaint because "Williams [was] of African descent, and not entitled by law to maintain his action." *Id.* at 496–97. The Court rejected that contention, even though the constitution at that time provided that the descendants of Africans were not entitled to the rights of citizens and "shall not be permitted to remain permanently in the republic without the consent of congress." *Id.* at 497. The Court held that insulating

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

Benton from Williams's battery claim would be "against law, contrary to the spirit of our institutions, and in violation of the dictates of common humanity." *Id.* The Court affirmed the trial court's judgment against Benton. *Id.*

Our courts have, since then, consistently protected individuals' right to be free from physical harm.[FN8] Blackstone described three "absolute rights," one of which was "[t]he right of personal security," consisting of "a person's legal and uninterrupted enjoyment of his life, his limbs, his body, his health, and his reputation." 1 WILLIAM BLACKSTONE, COMMENTARIES *125 (1769). The common law's recognition of an action for battery emerged as a means of "keep[ing] the peace by affording a substi-**\*116** tute for private retribution," [FN9] and we have recognized common law battery claims for more than a century. *See, e.g., Sargent v. Carnes,* 84 Tex. 156, 19 S.W. 378, 378 (1892) (affirming judgment on plaintiff's assault and battery claim). Protection from physical harm is thus more firmly entrenched in our common law than the right of privacy, a relative newcomer. W. PAGE KEETON, ET AL., THE LAW OF TORTS 849 (5th ed.1984)(noting that "[p]rior to the year 1890, no English or American court ever had granted relief expressly based upon the invasion [of the right of privacy]"). Indeed, we did not formally recognize the privacy tort until 1973, although our courts of civil appeals had hinted at it previously.[FN10]

FN8. *See, e.g., Operation Rescue–Nat'l v. Planned Parenthood of Houston & Se. Tex., Inc.,* 975 S.W.2d 546, 564 (Tex.1998) (holding that "protecting the health and safety of clinic patients is a compelling state interest justifying restrictions on the demonstrations"); *see also* RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL & EMOTIONAL HARM § 5 (stating that "[a]n actor who intentionally causes physical harm is subject to liability for that harm"); *cf. G., C. & S.F. R'y v. Styron,* 2

Posey 275, 276–77 (Tex. Comm'n App. 1883) (not precedential) (noting that the common law recognized actions for injuries " 'to the *absolute rights* of persons, as for assaults, batteries, wounding, injuries to the health, liberty and reputation' " (quoting 1 CHITTY ON PLEADINGS 60)(emphasis added)).

FN9. W. PAGE KEETON, ET AL., THE LAW OF TORTS 41 (5th ed.1984).

FN10. *See Billings v. Atkinson,* 489 S.W.2d 858, 860 (Tex.1973) (holding, for the first time, that "an unwarranted invasion of the right of privacy constitutes a legal injury for which a remedy will be granted"); *Milner v. Red River Valley Pub. Co.,* 249 S.W.2d 227, 229 (Tex.Civ.App.-Dallas 1952, no writ) (refusing to allow recovery for violation of right of privacy, because it was "not ... recognized under the common law, as it existed when we adopted it," but noting that other actions (such as penalties for libel and eavesdropping) provided some protection).

Nonetheless, thirty-five years ago, we held that the common law privacy protection exempted documents from disclosure under the PIA. *Indus. Found.,* 540 S.W.2d at 686. We have never addressed whether the common law right to be free from physical harm applies as well. We conclude that it does.

The Legislature has recognized the importance of protecting physical safety, notwithstanding the mandate that courts construe the PIA in favor of disclosure. *See* TEX. GOV'T CODE § 552.001(b). Several PIA exceptions are grounded in a concern for physical safety, and the Legislature's swift passage of an exception for information that would pose a "substantial threat of physical harm" confirms the primacy of this interest.[FN11]

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

FN11. *See, e.g.,* TEX. GOV'T CODE §§ 552.108 (exempting information held by a law enforcement agency or prosecutor if it involves a threat against a peace officer), 552.1176 (making home address, phone number, and social security number of Texas lawyers and judges confidential), 552.119 (making photographs of peace officers confidential), 552.127 (excepting identifying information from participants in neighborhood crime watch organizations), 552.151 (excepting certain information from disclosure if it would pose a "substantial threat of physical harm"); *see also* House Comm. on State Affairs, Bill Analysis, Tex. H.B. 1237, 80th Leg., R.S. (2007) (noting that release of attorney personal information may "subject attorneys including current and former state and federal judges and prosecutors and their family members to harm relating to their personal safety or possible identity theft"); House Comm. on State Affairs, Bill Analysis, Tex. H.B. 273, 75th Leg., R.S. (1997) (commenting on "threats and acts of retaliation against the members of [neighborhood crime watch organizations]"); House Comm. for Public Safety, Bill Analysis, Tex. H.B. 474, 70th Leg., R.S. (1987) (noting that routine release of peace-officer photographs endangers officers' lives).

Additionally, since the 1970s, the attorney general has applied a "special circumstances" exception to disclosure in over 230 cases. Often, these special circumstances included situations in which disclosure would place individuals in danger of physical harm.[FN12] The Attorney General **\*117** has described the exception as covering a "very narrow set of situations in which release of the information" [FN13] would cause someone to face "an imminent threat of physical danger." Tex. Att'y Gen. ORD1977–0169, at 6. It must be "more than a desire for privacy or a generalized

fear of harassment or retribution." *Id.*

FN12. *See, e.g.,* Tex. Att'y Gen. OR2008–03289 (holding that home address, telephone number, and other identifying information relating to a Dallas Area Rapid Transit employee fell within the special circumstances exception, as information was requested by a former employee who had threatened that individual); Tex. Att'y Gen. OR2008–01570 (determining that special circumstances justified withholding information, as city showed that former employee had made threatening statements to city staff); Tex. Att'y Gen. OR2004–10845 (holding that special circumstances justified withholding identity of alleged crime victim due to potential threat to victim's safety); Tex. Att'y Gen. ORD1977–0169 (holding that employees' addresses could be withheld because employees showed that their lives would be endangered if the information was disclosed).

FN13. Tex. Att'y Gen. OR2004–10845, at 2.

The court of appeals held that the Attorney General's "special circumstances" exception conflicted with *Industrial Foundation,* in which we said that the "sole criteria" for determining whether information was exempt from disclosure as "confidential by judicial decision" was whether the information was of legitimate public concern and whether its publication would be highly objectionable to a reasonable person. 287 S.W.3d at 394 (citing *Industrial Foundation,* 540 S.W.2d at 686). That is an accurate statement for assessing matters involving that branch of the *invasion-of-privacy* tort (the only exception at issue in *Industrial Foundation* ), but not for other matters that are confidential under judicial decision. *See, e.g., Ctr. for Econ. Justice v. Am. Ins. Ass'n,* 39 S.W.3d 337, 348 (Tex.App.-Austin 2001, no pet.) (determining that because the "[c]ommon law protects information that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

meets the traditional six-factor test for trade-secret protection," information was excepted from disclosure under the PIA). The court of appeals' holding is understandable, given that the Attorney General has characterized the "special circumstances" exception as falling under the common law privacy umbrella. *See, e.g.,* Tex. Att'y Gen. OR2005–07052, at 6 (noting that "information also may be withheld under section 552.101 in conjunction with common law privacy upon a showing of certain 'special circumstances' "). But freedom from physical harm is an independent interest protected under law, untethered to the right of privacy.

The privacy interest protects against four distinct kinds of invasions (intrusion upon seclusion, public disclosure of private facts, false light publicity, and appropriation); physical harm is not among them.[FN14] KEETON, THE LAW OF TORTS 40, 851 (noting that privacy is "not one tort, but a complex of four"). We have characterized privacy as "the right of an individual to be left alone, to live a life of seclusion, to be free from unwarranted publicity." *Billings v. Atkinson,* 489 S.W.2d 858, 859 (Tex.1973) (citing 77 C.J.S. Right of Privacy § 1). By contrast, the common law right to be free from physical harm is an interest in personal integrity, distinct from that covered by the privacy interest. KEETON, THE LAW OF TORTS 40.[FN15] It is integral to a civil society. Although mischaracterized as a privacy related exception, the "special circumstances" doctrine protects the right we have long recognized at common law.

> FN14. As we noted in *Industrial Foundation,* the United States Supreme Court has also recognized a constitutional right of personal privacy in certain situations. *Indus. Found. of the South v. Tex. Indus. Accident Bd.,* 540 S.W.2d 668, 679 (Tex.1976).

> FN15. *See also Fisher v. Carrousel Motor Hotel, Inc.,* 424 S.W.2d 627, 629 (Tex.1967) (describing battery as protecting "[t]he

plaintiff's interest in the integrity of his person") (quoting PROSSER, LAW OF TORTS 32 (3d ed.1964)).

[2] Both the legislative and executive branches have recognized that, as valuable **\*118** as the right to public information is, a person's physical safety supersedes it. Those branches are not alone. Our common law protects—and has always protected—that interest, making such information confidential. We must decide, then, the appropriate standard for assessing whether disclosure would violate that interest. While we are not bound by the Legislature's policy decisions when we consider protections afforded by the common law, "the boundaries the Legislature has drawn do inform our decision." *Ford Motor Co. v. Miles,* 967 S.W.2d 377, 383 (Tex.1998); *see also Austin v. HealthTrust, Inc.,* 967 S.W.2d 400, 403 (Tex.1998). We conclude that the "substantial threat of physical harm" standard enunciated by the Legislature appropriately describes the interest protected under the common law, and information may be withheld if disclosure would create a substantial threat of physical harm. *See* TEX. GOV'T CODE § 552.151. We next examine that standard in light of the record produced at trial.

[3] The trial court heard testimony from witnesses and reviewed the relevant documents and other exhibits. Although DPS preferred categories of lump sum expenses, showing amounts spent on airfare, lodging, meals, car rental, and related matters, it argued that disclosing the vouchers themselves would give those intent on harming the governor the means to accomplish that goal. DPS contended that the information revealed travel patterns, the number and placement of DPS officers on the detail, and how far in advance officers visit a location prior to the governor's arrival. The publishers presented evidence that the itemized vouchers and related documents disclose more information (and are more valuable to taxpayers, who fund the travel) than do line items with lump sum totals. The trial court concluded, categorically, that

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

"public disclosure of the information in the vouchers requested by Cox and Hearst would not put any person in an imminent threat of physical danger or create a substantial risk of serious bodily harm from a reasonably perceived likely threat"—the standard for the Attorney General's "special circumstances" test and the constitutional exception urged by DPS, respectively. This determination is close, but not identical, to the standard we announce today for the common law right of physical safety.

We have remanded a case to the trial court when we have changed our precedent or when the applicable law has otherwise evolved between the time of trial and the disposition of the appeal. *See, e.g., Twyman v. Twyman,* 855 S.W.2d 619, 626 (Tex.1993) (remand in interest of justice because case was tried on legal theory overruled by Court); *Caller–Times Publ'g Co., Inc. v. Triad Commc'ns, Inc.,* 826 S.W.2d 576, 588 (Tex.1992) (remand in interest of justice because Court announced new liability standard). We have also remanded for a trial court to determine "in light of [our] opinion, whether any of the information should be withheld from disclosure because confidential." *Indus. Found.,* 540 S.W.2d at 686. Here, our decision recognizes, for the first time, a common law physical safety exception to the PIA. And even though the interest protected under that exception is well-established in our law, we have never before addressed whether or how it applies to the PIA. We conclude that a remand is appropriate.

On remand, the trial court must closely examine each of the disputed documents. DPS is likely correct in one sense: disclosure of *some* of the information in the vouchers may create a substantial threat of physical harm because it reveals specific details about the number of officers assigned to protect the governor, their general**\*119** location in relation to him, and their dates of travel. Indeed, the vouchers divulge the number of officers the DPS deemed necessary for the governor's security, the specific location (hotel and room number) where the officers resided when

providing that security, and the identity of each officer the Department assigned to the governor's protection. Because the past is prologue, at least when it reveals protocol DPS has implemented for ensuring the safety of government officials, we cannot agree that information from prior trips could not be used to inflict future harm.

But this may not justify withholding all but the ultimate dollar figure for trips abroad, as DPS proposes. In this respect, the publishers' request has merit: the documents themselves provide a more complete picture of how taxpayer money is spent than do the general categories and totals produced by DPS. This fact was not lost on the Legislature, which categorized certain information in vouchers as core public information. *See* TEX. GOV'T CODE § 552.022(a). And we agree with the trial court that the public has a legitimate interest in how public money is spent on official state business. The dividing line between disclosure and restraint must be determined by proof. To the extent DPS can show, with detailed evidence or expert testimony, that revelation substantially threatens harm—as it has with respect to the number of guards protecting the governor—then the information at issue may be withheld. A certain amount of deference must be afforded DPS officers and other law enforcement experts about the probability of harm, although vague assertions of risk will not carry the day. But the public's right to "complete information" [FN16] must yield when disclosure of that information would substantially threaten physical harm. On remand, the trial court must ascertain, under this standard, what information may be confidential and what must be disclosed. Accordingly, we remand the case for a new trial.

FN16. TEX. GOV'T CODE § 552.001(a).

A brief word in response to the concurrence. The concurrence says our holding would "establish judge-made exceptions to the PIA's required disclosure of information to the public, contradicting the

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

unanimous determination in our precedent, *Industrial Foundation of the South v. Texas Industrial Accident Board.*" 343 S.W.3d at 121. But *Industrial Foundation* recognized that the PIA is subject to the common law and itself adopted a "judge-made" exception to disclosure: the right of privacy. *Indus. Found.,* 540 S.W.2d at 683 (holding that right of privacy acknowledged in *Billings v. Atkinson* was "the type of information which the Legislature intended to exempt from mandatory disclosure" under the PIA provision excepting matters confidential by judicial decision). We squarely held in *In re Georgetown* (a case involving core public information) that "other law" included not just statutes and rules, but "judicial decisions." *Georgetown,* 53 S.W.3d at 332. To reach that holding, we relied on a United States Supreme Court decision that concluded the phrase "all other law," by itself, "indicates no limitation" and did not allow any distinction "between positive enactments and common-law rules of liability." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n,* 499 U.S. 117, 128–29, 111 S.Ct. 1156, 113 L.Ed.2d 95 (1991), *quoted in Georgetown,* 53 S.W.3d at 333. The concurrence's position is not unlike the *Georgetown* dissent's, a position we rejected then. We reject it again today. *Compare* 343 S.W.3d at 124 (suggesting that " 'other law' must mean other statutory law where **\*120** the Legislature has declared certain information confidential"), *with Georgetown,* 53 S.W.3d at 339 (Abbott, J., dissenting) (suggesting that only the Legislature could promulgate laws, so that rules of procedure could not be "other law").

[4] The concurrence argues that because the information itself may not implicate privacy concerns, it cannot be protected from disclosure as "expressly confidential under other law." TEX. GOV'T CODE § 552.022. But information does not exist in a vacuum. When disclosure carries with it a serious risk of bodily harm, we cannot ignore those consequences when deciding whether common law protections apply. *Cf. U.S. Dep't of State v. Ray,* 502 U.S. 164, 177, 112 S.Ct. 541, 116 L.Ed.2d 526 (1991) (considering re-

taliatory action that would occur if information was disclosed).[FN17] Our common law protects individuals from physical harm, and, consistent with the PIA, [FN18] that protection extends to the disclosure of information that substantially threatens such harm.

> FN17. *See also* Michael Hoefges et al., *Privacy Rights Versus FOIA Disclosure Policy: The "Uses and Effects" Double Standard in Access to Personally–Identifiable Information in Government Records,* 12 WM. & MARY BILL RTS. J. 1, 7 (2003) (noting that "the [Supreme] Court considers derivative uses and secondary effects of disclosure on the privacy side as a matter of course").

> FN18. TEX. GOV'T CODE § 552.022(a).

**III. Are the vouchers confidential under Government Code section 418.176?**

Finally, DPS contends the documents are exempt from disclosure under Government Code section 418.176. That statute, passed in 2003,[FN19] makes certain information relating to emergency response providers confidential. The law provides, in pertinent part:

> FN19. *See* Act of June 2, 2003, 78th Leg., R.S., ch. 1312, § 3, 2003 Tex. Gen. Laws 4809, 4813.

Information is confidential if the information is collected, assembled, or maintained by or for a governmental entity for the purpose of preventing, detecting, responding to, or investigating an act of terrorism or related criminal activity and:

(1) relates to the staffing requirements of an emergency response provider, including a law enforcement agency, a fire-fighting agency, or an emergency services agency;

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

(2) relates to a tactical plan of the provider; or

(3) consists of a list or compilation of pager or telephone numbers, including mobile and cellular telephone numbers, of the provider.

TEX. GOV'T CODE § 418.176(a).

DPS contends that section 418.176 is "other law" making the vouchers confidential. *See id.* 552.101. Cox and Hearst argue that the vouchers do not meet section 418.176's requirements and, moreover, that DPS waived the issue by failing to raise it in the trial court and the court of appeals. Because we are remanding for a new trial, DPS may pursue this argument in the trial court in the first instance. *Cf. Kallam v. Boyd,* 232 S.W.3d 774, 776 (Tex.2007) (deferring decision on issue until it had been fully litigated below " 'so that we will have the benefit of developed arguments on both sides and lower court opinions squarely addressing the question' " (quoting **\*121***Yee v. City of Escondido,* 503 U.S. 519, 538, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992))).

**IV. Conclusion**

We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion. TEX.R.APP. P. 60.2(d).

Justice WAINWRIGHT delivered a concurring opinion, joined by Justice JOHNSON.
Justice MEDINA and Justice WILLETT did not participate in the decision.
Justice WAINWRIGHT, joined by Justice JOHNSON, concurring in the judgment.
The media requested vouchers that detail expenditure of public funds for the governor's security detail when he travels. Because it concerns how the government spends taxpayer monies, the information in vouchers is not just "public information" under the Public Information Act (PIA), it is "core" public in-

formation, with a greater emphasis on disclosure than other public information. *See* TEX. GOV'T CODE § 552.022(a). The Texas Department of Public Safety argues that the information should not be disclosed, even though it is core public information, because of the risk to the safety of elected officials. There is no express exception to disclosure for this core public information. This tension resulted in this Court concluding that it may establish judge-made exceptions to the PIA's required disclosure of information to the public, contradicting the unanimous determination in our precedent *Industrial Foundation of the South v. Texas Industrial Accident Board. See* 540 S.W.2d 668, 682 (Tex.1976) (plurality op.) ("We decline to adopt an interpretation which would allow the court in its discretion to deny disclosure even though there is no specific exception provided...."); *Id.* at 692 (Reavley, J., dissenting) ("It was not the intention of the Legislature to turn over the administration of the Open Records Act to the judiciary."). The Court concludes that it is "not bound by the Legislature's policy decisions" in deciding common law exceptions to the statute, leaving no apparent boundaries on new common law exceptions to the legislated disclosure requirements in the PIA that courts may now create. 343 S.W.3d 112.

Further complicating the case, the trial court made an express finding that "[p]ublic disclosure of the information in the vouchers requested by [the media representatives] would not put any person in an imminent threat of physical danger or create a substantial risk of serious bodily harm from a reasonably perceived likely threat." The Court acknowledges a lack of expertise in such matters and credits the law enforcement testimony that disclosure of the vouchers would create a threat of injury. While I agree with the Court's strong desire to keep public officials safe, once the Legislature weighed in, the question of keeping public information from the people is not one for the courts. The Court should not judicially create an exception to disclosure that contradicts the Legislature's expressed intent in the PIA. I cannot join the Court's

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

opinion, but because I believe that DPS argued, and the trial court accepted, an exception not allowed by law, I would remand in the interests of justice for the trial court to consider other exceptions grounded in "other law."

### I. Background

The Public Information Act contains a comprehensive scheme arming the public with statutory mandates for the government to disclose information "collected, assembled,**\*122** or maintained under a law or ordinance" or in connection with business by or for a governmental body, and it is to be liberally construed to grant requests for information. TEX. GOV'T CODE §§ 552.001(b), .002(a). All such information is subject to disclosure unless it is either later excepted from the definition of "public information" or it falls under an exception to disclosure. *See id.* §§ 552.101–.151; *cf., e.g.,* TEX. ELEC.CODE § 13.004(c) (defining certain voter registration information as confidential and not "constitut[ing] public information" for purposes of the PIA). "Public information" may be excepted from disclosure under Subchapter C, or may be prohibited from disclosure if the information is deemed "confidential." TEX. GOV'T CODE §§ 552.007, .101, .352.

There is, however, another level of "public information." Members of this Court and the Attorney General's Office have, in the past, called it "super public" information; today the Court calls it "core public information." *See* 343 S.W.3d 112; *In re City of Georgetown,* 53 S.W.3d 328, 341 (Tex.2001) (Abbott, J., dissenting); Tex. Att'y Gen. OR2004–7388. This is the type of public information at the core of government functions, generally relating to laws actually enacted, decisions of the judiciary, votes of the Legislature, and how the government spends the people's money. *See* TEX. GOV'T CODE §§ 552.022, .0221, .0225. As such, core public information is not subject to the routine exclusions in Subchapter C, but may be withheld from the public only if the information is "expressly confidential under other law." *Id.* §

552.022(a). This rule was important enough that the Legislature specifically commanded courts to comply with it. Section 552.022(b) mandates that "[a] court in this state may not order a governmental body or an officer for public information to withhold from public inspection any category of public information described by Subsection (a) or to not produce the category of public information for inspection or duplication, unless the category of information is expressly made confidential under other law." *Id.* § 552.022(b).

Reporters representing the *Austin American–Statesman, San Antonio Express–News,* and the *Houston Chronicle* sent requests to DPS officials. One reporter requested "travel vouchers for Gov. Rick Perry's security detail for all trips out of state during two time periods. The first time period is January through December 2001. The second time period is January through June 2007." Another requested "access to or copies of travel vouchers for Gov. Rick Perry's security detail." The parties acknowledge that these requests include "information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body." *See id.* § 552.022(a)(3). As such, the information requested is core public information. *Id.* § 552.022.

### II. Disclosure of Core Public Information as "Expressly Confidential Under Other Law"

Compared to the dozens of exceptions for disclosure of "regular" public information, there is only one exception to the PIA's mandated disclosure of core public information—if it is "expressly confidential under other law." *Id.* The text of section 552.022's narrow exclusion contains three facial requirements: the information must be "confidential," such designation that the information is confidential must be "express," and the source of the confidential designation must be "other law." This requirement was put in place by a 1999 amendment. *See* Act of May 25, 1999, 76th Leg., R.S., ch. 1319, § 5, 1999 Tex. Gen. Laws 4501. Prior to the amendment, **\*123** section 552.022

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

of the Government Code merely recognized the types of information enumerated in section 552.022 were "public information." It recognized that vouchers were public information "if the information is not otherwise made confidential by law." *Id.* But the amendment added language to the introductory clause, requiring that all types of core public information enumerated in section 552.022 are public information "and not excepted from required disclosure under this chapter unless they are expressly confidential under other law." *Id.*[FN1] This 1999 amendment was heralded as a "true success" in providing a "citizen ... full and complete information regarding official acts of those who represent them and the affairs of government." Rick L. Duncan, *No More Secrets: How Recent Legislative Changes Will Allow the Public Greater Access to Information,* 1 TEX. TECH. J. TEX. ADMIN. L. 115, 133 (2000). We should give effect to all the words in a statute, and to changes in the words of legislative acts. *See Indep. Life Ins. Co. of Am. v. Work,* 124 Tex. 281, 77 S.W.2d 1036, 1039 (1934). As discussed below, the Court's opinion does not, as it ignores the "express," "confidential," and "other law" requirements of the statute.

> FN1. Recently, the Texas Legislature amended section 552.022's "expressly confidential under other law" provision, and also added specific exceptions in the PIA for certain confidential information. *See generally* Act of May 20, 2011, 82nd Leg., R.S. (to be codified at TEX. GOV'T CODE chs. 51, 552). After the effective date, core public information may be withheld from disclosure if it is "made confidential under this chapter or other law." *Id.* § 2 (to be codified at TEX. GOV'T CODE § 552.022). This amendment does not apply to the case at bar, because the statute's effective date is September 1, 2011. *Id.* § 41.

### *A. Other Law*

"Other law" means law other than the Public In-

formation Act. *City of Georgetown,* 53 S.W.3d at 332–33. I disagree with the Court's assertion that "other law" exceptions to disclosure of core public information can mean "judicial decisions." 343 S.W.3d 112. The Court cites as authority for its holding the case of *In re City of Georgetown,* a case in which the Court examined whether rules in the Texas Rules of Civil Procedure regarding attorney-client privilege constituted "other law" under section 552.022. *Id.* (citing *City of Georgetown,* 53 S.W.3d at 332). In *City of Georgetown,* the Court held that because our enacted rules of court "have the same force and effect as statutes," and the rules were derived from previously enacted statutes, such rules constitute "other law" under section 552.022. 53 S.W.3d at 332 (quotation omitted). The Court today misreads *City of Georgetown,* asserting that it serves as the basis for creating common law exceptions to the PIA. The Court cites no other Texas authority for this holding.

Other provisions in the PIA also indicate that judicial decisions should not be "other law" for the purpose of the section. *See Molinet v. Kimbrell,* ––– S.W.3d ––––, 2011 WL 182230 (Tex.2011) (noting that we examine the "entire act" to glean the meaning of a statute's text (citations and quotations omitted)). In section 552.101 of the PIA, the Legislature excepted from disclosure information that is "considered to be confidential by law, either constitutional, statutory, or by judicial decision." TEX. GOV'T CODE § 552.101. This provision applies to "public information" defined and disclosable pursuant to section 552.021, and not to the core public information delineated in section 552.022. If we were to interpret "other law" in section 552.022 to include law made pursuant to a judicial decision, we would effectively apply section 552.101's "judicial decision" exception to disclosure to core public information. This **\*124** is contrary to the Legislature's explicit statement that core public information is "*not excepted from required disclosure under this chapter,*" including section 552.101. *Id.* § 552.022 (emphasis added). The most logical reading, then, is that "other law" must mean

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

other statutory law where the Legislature has declared certain information confidential,[FN2] or rules of court drafted by this Court that are commensurate with statutes. *See City of Georgetown,* 53 S.W.3d at 333.

> FN2. This is essentially the limited exception under the federal Freedom of Information Act. *See* 5 U.S.C. § 552(b)(3) (excluding from FOIA's reach "matters that are specifically exempted from disclosure by statute ... if that statute ... (i) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (ii) establishes particular criteria for withholding or refers to particular types of matters to be withheld; and specifically references § 552(b), if passed after 2009").

The Court argues that the "other law" in this case is the "individual['s] right to be free from physical harm," as manifested in the tort of battery. 343 S.W.3d 112. The Court posits that because physical safety is "the primary concern of every government," and the PIA protects private information, then it must surely protect physical safety as well. *Id.* at 115 (quoting *United States v. Salerno,* 481 U.S. 739, 755, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). The reasoning is a sound policy argument in drafting legislation. Elected officials should not be subjected to harm by dangerous persons whose task may be made easier through public information requests. But the policy decision of how to satisfy that objective is not ours. The Legislature has made nondisclosure of the core public information at issue dependent on it being specifically designated confidential by rules or statutes outside of the PIA.

Further, this Court has never held that other torts would protect the disclosure of core public information under section 552.022. In *Industrial Foundation of the South v. Texas Industrial Accident Board,* we decided the scope of information protected by "judicial decision" under the predecessor to Government Code section 552.101. 540 S.W.2d at 683. This

is not an interpretation of "other law" under section 552.022, and, as discussed above, the two provisions are not coterminous.

In *Industrial Foundation,* all members of the Court agreed that the scope of the "judicial decision" exception did not give the Court a blank check to create common law exceptions to the PIA. *Id.* at 681–82 (plurality op.). "It was not the intention of the Legislature to turn over the administration of the Open Records Act to the judiciary." *Id.* at 692 (Reavley, J., dissenting, joined by Steakley, Pope, and Denton, JJ.); *see also Tex. Comptroller of Pub. Accounts v. Att'y Gen. of Tex.,* —— S.W.3d ——, 2010 WL 4910163 (Tex.2010) (Wainwright, J., dissenting) ("[C]ourts do not have the discretion to classify information as confidential on an ad hoc basis; confidentiality of public information is to be determined by the terms of the Act."). As I discussed in *Texas Comptroller,* the Legislature limited our ability to create judicial exceptions to the PIA. *Id.* at ——. Thus, the Legislature's definition of the "judicial exception" includes only the privacy torts recognized at the time of *Industrial Foundation. See* 540 S.W.2d at 678–81. There was one such tort at that time-public disclosure of private facts. I would thus limit the scope of the "judicial decision" exception to that tort. My fundamental concern is the Court's willingness to create common law exceptions to the comprehensive disclosure scheme of the PIA, weakening the PIA in three consecutive opinions interpreting the Act— **\*125***City of Dallas v. Abbott,* 304 S.W.3d 380, 387 (Tex.2010) (extending response periods by governmental entities to requests for public information when the request was unclear), *Texas Comptroller,* —— S.W.3d at —— (holding dates of birth "confidential" under "judicial decision" and excepting them from disclosure under the PIA), and this case, *DPS v. Cox.*

Immediately after the dispute over the disclosure of travel vouchers arose, the Legislature considered making such voucher information confidential. [FN3] But it did *not* declare vouchers from security details

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

"confidential," nor did it except these vouchers from the definition of "public information" under 552.022(a). Instead, the Legislature passed what is currently codified as section 552.151 of the Government Code.FN4 That section provides:

> FN3. Parallel bills in the Texas House and Senate during the current legislative session attempted to specifically make "a voucher submitted or to be submitted under [Chapter 660 of the Government Code] confidential and may not be disclosed under the PIA" if the voucher was for expenses incurred in protecting an elected official or the official's family. H.B. 3131, 82nd Leg. R.S., § 1 (introduced March 10, 2011); S.B.1923, 82nd Leg., R.S., § 1 (introduced April 29, 2011). Neither bill came to a vote before each bill's respective chamber during the regular session. During the special session in June 2011, Senate Bill 1 was amended to make vouchers or other reimbursement forms confidential for a period of eighteen months following the date of travel "if the reimbursement or travel expense incurred by a peace officer while assigned to provide protection for an elected official of this state or a member of the elected official's family." S.B. 1, 82nd Leg., 1st C.S., § 79A.01 (introduced May 31, 2011). Following the eighteen-month period, the vouchers "become subject to disclosure under Chapter 552 and are not excepted from public disclosure or confidential under that chapter or other law," with seven exceptions, including the personal safety exception. *Id.* During the eighteen-month period, agencies are required to submit expense summaries providing specified, detailed information. *Id.* The Legislature has provided that this Court will have "original and exclusive mandamus jurisdiction" over the construction, applicability, or constitutionality of the amendment, and the amendment applies only to vouchers

created on or after September 1, 2011. *Id.; see also id.* § 80. The Governor has not yet taken action on the bill.

> Because the vouchers at issue in this case are not covered by the new section, its interpretation is not before this Court.

> FN4. The original enacting legislation added the exception as section 552.151. *See* Act of May 31, 2009, 81st Leg., R.S., ch. 283, § 4, 2009 Tex. Gen. Laws 742, 743 (codified at TEX. GOV'T CODE § 552.151). This session, the Legislature redesignated the section as section 552.152, effective September 1, 2011. *See* Act of May 5, 2011, 82nd Leg., R.S., S.B. 1303, § 27.001(20). For the sake of clarity, this opinion will refer to the provision as presently in force, section 552.151.

Information in the custody of a governmental body that relates to an employee or officer of the governmental body is excepted from the requirements of Section 552.021 if, under the specific circumstances pertaining to the employee or officer, disclosure of the information would subject the employee or officer to a substantial threat of physical harm.
TEX. GOV'T CODE § 552.151 (to be recodified at TEX. GOV'T CODE § 552.152). The amendment applies only to information to be disclosed pursuant to section 552.021, *i.e.,* regular "public information." It is an exception in Subchapter C, which specifically does not apply to core public information, like information in the vouchers at issue in this case. The Court argues that the Legislature's "swift passage" of section 552.151 of the Government Code "confirms the primacy" of the government's interest in protection against physical harm. 343 S.W.3d 112. But the Legislature's intent is best manifested in what actually becomes law. *Molinet, —— S.W.3d at ——* ("The plain meaning of the text is the best expression of legislative intent unless a

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

**\*126** different meaning is apparent...."). The promulgation of section 552.151 demonstrates the opposite. Section 552.151 is not an exception to the mandated disclosure of core public information. The Court's opinion grafts the Legislature's test found in section 552.151 onto situations in which the Legislature unambiguously did not intend. The Court would rewrite section 552.151 to hold that such information is "excepted from the requirements of sections 552.021 or 552.022 " and moves the section out of the PIA such that it can be considered "other law." 343 S.W.3d 112 (emphasis added). The Court should not by common law override a specific statutory mandate.

### *B. Confidential*

Even if "other law" may include judicial decisions and the common law, section 552.022 requires that the "other law" declare the information "confidential." "Confidential" may have a fluid meaning, such as "protected," "secured," or "safeguarded." *Cf. City of Georgetown,* 53 S.W.3d at 334 ("A law does not have to use the word 'confidential' to expressly impose confidentiality."). The Legislature has enacted a plethora of laws that deem certain information "confidential" for myriad purposes. *See Tex. Comptroller,* ––– S.W.3d –––– (Wainwright, J., dissenting) (noting that "no fewer than 100 Texas statutes classify information as confidential for purposes of the PIA"); *City of Georgetown,* 53 S.W.3d at 339–40 (Abbott, J., dissenting) (providing four examples of information "expressly made confidential" in the Transportation Code, Education Code, and Family Code). Likewise, there are a number of tort actions, both statutory and common law, that recognize that certain types of information are private or confidential. [FN5] But in every instance, the *information itself* is the issue, and the statute, decision, rule, or crime exists to protect the information itself or a person who will be directly harmed by the information's release.

> FN5. Examples include trade secrets, privilege, public disclosure of private facts, and

gag orders during trial. *See In re Bass,* 113 S.W.3d 735, 739 (Tex.2003) (defining trade secrets); RESTATEMENT (THIRD) OF UNFAIR COMPETITION §§ 39, 40, 41 (similarly defining trade secrets and remedies available for protection of trade secrets); TEX.R. CIV. P. 193.3 (setting standards for asserting privileges in discovery); *In re E.I. DuPont de Nemours & Co.,* 136 S.W.3d 218, 222–23 (Tex.2004) (per curiam) (providing for mandamus relief for erroneous rulings on privileged documents); *Indus. Found. of the S. v. Tex. Ind. Accident Bd.,* 540 S.W.2d 668, 682–83 (Tex.1976) (plurality op.) (discussing the tort of public disclosure of private facts); *Davenport v. Garcia,* 834 S.W.2d 4, 10 (Tex.1992) (discussing a court's authority to issue gag orders).

Once again, the Court creates a judicial exception to disclosure of information in the PIA based on a possible use of the information rather than the nature of the information itself. In *Texas Comptroller,* the Court, for the first time, considered derivative harm arising from the release of information—whether disclosure of birth dates of public employees, along with other information, could be used for identity theft. The Court held that such potential tortious use of the public information constituted grounds to withhold the information because it would constitute a "clearly unwarranted invasion of personal privacy." *Tex. Comptroller,* ––– S.W.3d at ––––. But the courts are not "free to balance the public's interest in disclosure against the harm resulting to an individual by reason of such disclosure." *Indus. Found.,* 540 S.W.2d at 681–82 (plurality op.). "This policy determination was made by the Legislature when it enacted the statute." *Id.* at 682. The Legislature granted the people's right to the information after considering**\*127** its potential uses and harms. The Court, apparently believing the Legislature did not sufficiently execute its task, finds a new common law exception to disclosure based on its own views of harm in the potential use of, on this

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

occasion, core public information.

In *Texas Comptroller,* as here, the Court did not restrict itself to considering whether the actual release of the information (state employees' birth dates) was harmful, but rather whether, in the wrong hands and in combination with other information, such as Social Security numbers, state employees might be at higher risk for identity theft. *Tex. Comptroller,* ——S.W.3d ——. The harm was derivative, and the analysis allowed for post-hoc, judicially created exceptions to disclosure. For the same reasons as in *Texas Comptroller,* I believe the Court's analysis and application of derivative harm to create an exception to disclosure is inappropriate, particularly so because of the core public nature of the information at issue, and because the Court's rule could permit unfettered judicial discretion in declaring any information not subject to disclosure. Its discovery of this common law right may even inadvertently have the effect of creating some common law cause of action for "wrongful disclosure of information," and may have the potential to randomly and unnecessarily subject various government agencies and officers to criminal liability for simply disclosing what the Legislature determined, and the Court admits, is core public information. *See* TEX. GOV'T CODE § 552.352 (defining the misdemeanor crime of distribution of information "considered confidential under the terms of this chapter").

### *C. Expressly*

Even if our common law torts are "other law," and even if, somehow, the threat of the tort of battery declares some unknown information "confidential," the final requirement of section 552.022 is that the "other law" must "expressly" make the information "confidential." The Court does not address how it believes that the information at issue here is "expressly" confidential. Merriam–Webster's dictionary defines "express" as "directly, firmly, and explicitly stated." MERRIAM–WEBSTER DICTIONARY, *available at* http:// www. merriam- webster. com/ dictionary/ express (last visited June 21, 2011). The

tort of battery is when a person "(a) ... acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results." RESTATEMENT (SECOND) OF TORTS § 13 (1965); *see also Bailey v. C.S.,* 12 S.W.3d 159, 162 (Tex.App.-Dallas 2000, no pet.) ("A person commits a battery if he intentionally or knowingly causes physical contact with another when he knows or should reasonably believe the other person will regard the contact as offensive or provocative."). Nowhere in the tort's elements, or in any of our cases, is it "directly, firmly, and explicitly stated" that battery protects information from disclosure. The tort concerns harmful or offensive intentional contact. The Court ignores this critical requirement of the statute limiting a court's ability to protect information from disclosure.

Simply put, common law battery is not "other law" under which the information at issue here is "expressly confidential." The Court oversteps legislated limits recognized in *Industrial Foundation* to interpret exceptions to disclosure under the PIA. For this reason, I do not join in the Court's opinion.

### *128 III. Remand Is Appropriate

Although I cannot join the Court's opinion, I join its judgment that remand is appropriate. I believe DPS's and the trial court's improper reliance on the "special circumstances" exception, and the possibility of harm to public officials, warrants a remand in the interests of justice. I also believe that DPS should have the opportunity to argue that a specific exception to disclosure made by the Homeland Security Act should apply.

The Court relies on and builds upon the Attorney General's "special circumstances" test, which the Attorney General has applied numerous times in various letter rulings, in support of its holding today. However, this test, and its rulings, do not apply to the information at issue here nor to the legal theory upon

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

which the Court relies in withholding the information.

The genesis of the test is a one-page letter ruling from 1974, that was later expanded in 1977. It was not a freestanding test to withhold information, but rather was used in determining whether information could be withheld as a "clearly unwarranted invasion of personal privacy," a separate, statutory exception to disclosure of non-core public information in the Act. Tex. Att'y Gen. ORD–54 (1974); Tex. Att'y Gen. ORD–169 (1977); *see also* TEX. GOV'T CODE § 552.102 (providing an exception for regular "public" information for information in a personnel file, "the disclosure of which would constitute a clearly unwarranted invasion of personal privacy"). In other words, the attorney general examined "special circumstances," such as an employee's specific history of being threatened, harassed, or stalked, to see if information in a state employee's personnel file should not be disclosed under what is now section 552.102 of the PIA. Rather than protecting more information from disclosure, the "special circumstances" test, as initially articulated by the attorney general, actually required *more* information to be disclosed, because only if the "special circumstances" existed could an employee's personnel information (including his or her home address, phone number, and other personal information) be withheld. Tex. Att'y Gen. ORD–54 (1974); Tex. Att'y Gen. ORD–169 (1977).

In later attorney general opinions, though, the "special circumstances" test was not discussed in conjunction with section 552.102's "clearly unwarranted invasion of personal privacy" in employees' personnel files, but rather as a privacy exception or "other judicial decision" under section 552.101. *See, e.g.,* Tex. Att'y Gen. OR2004–10845. No party extensively discussed the evolution of this test in the attorney general's office from 1977 until today. However, it appears that the attorney general's basis for applying the "special circumstances" test to information not subject to disclosure was based on the application of the tort of public disclosure of private

facts (discussed in *Industrial Foundation* and analyzed under the employment file exception, predecessor to section 552.102) as another "judicial decision" excluding information pursuant to section 552.101.

It also appears that the Attorney General has determined that section 5 52. 101 is "other law" for the purpose of deciding whether core public information can be withheld. I agree that the tort of public disclosure of private facts may be a "judicial decision," as it was extant at the time the PIA was promulgated, that could be the basis of an exclusion from disclosure under section 552.101 and may also be "other law" by which core public information is "expressly confidential" under section 552.022. However, section 552.101, in and of itself, cannot be "other law" to withhold core public information. To enact such a rule would thwart the Legislature's**\*129** expressed intent that core public information is not subject to the Subchapter C exceptions, including section 552.101. This is further evidenced by the fact that the Legislature's new "special circumstances" exception, which appears to be similar to the Attorney General's so-called common law privacy "special circumstances" exception, is in Subchapter C, thus currently applying to "public information" but not core public information that must be disclosed pursuant to section 552.022. Therefore, the Attorney General's "special circumstances" exception should not apply to the information here.

The Attorney General's "special circumstances" test cannot apply in this situation. However, because the use of the test as an independent basis for withholding information was reasonably well established in a number of attorney general letter rulings for a number of years, because DPS and the trial court erroneously relied upon the test, and because of the serious personal safety concerns at issue in this case, I would remand in the interest of justice to allow DPS to argue any and all exceptions that are based on "other law," such as one based on Government Code section

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.

343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428
**(Cite as: 343 S.W.3d 112)**

418.176, the exception from the Homeland Security Act. *See* TEX.R.APP. P. 60.3; *Low v. Henry,* 221 S.W.3d 609, 621 (Tex.2007) (remanding "to allow the parties to present evidence responsive to [the Court's] new guidelines").

On remand, the trial court should consider whether specific information in the vouchers raises serious security concerns and should be redacted. For example, in the sample submitted *in camera* to the Court, one cannot only identify at which specific hotels the Governor's security detail stayed and, in-ferentially, whether they stayed in the same hotel as the Governor, but also when the members of the detail arrived and departed from the foreign country. Other information in the vouchers, such as total amounts spent for lodging or costs of meals, may not present the same security concerns. The trial court should carefully consider the varying levels of concern for the different types of information in the vouchers.

**IV. Conclusion**

There is legitimate concern about fashioning a rule that could allow those who want to do harm to government officials to gain information to help them do so through the government's own records. The rule the Court announces today—that it can fashion common law exceptions to disclosure of core public information—is based on a genuine concern to protect our public officials from physical harm and acts of terrorism, but it thwarts the Legislature's clear state-ment that it, not the courts, grants exceptions to the public's access to public information. There are many statutes and rules that make information "expressly confidential," but the judge-made tort of battery is not one, and we should guard against any court creating reasons to keep government information from its citizens. That policy-laden task, as emphasized in *Industrial Foundation,* belongs to the Legislature. Because the Court's rule opens the door to new judi-cially created exceptions to disclosure of core public information and weakens what was one of the strongest, most robust freedom of information statutes

in the nation,[FN6] I respectfully cannot join the Court's opinion. But because I believe remand in the interest of justice is appropriate, I join the Court's judgment.

> FN6. *See City of Dallas,* 304 S.W.3d at 395 n. 5 (Wainwright, J., dissenting) (citing 151 Cong. Rec. S1525–26 (Feb. 16, 2005) (statement of Senator John Cornyn)).

Tex.,2011.
Texas Dept. of Public Safety v. Cox Texas Newspa-pers, L.P.
343 S.W.3d 112, 39 Media L. Rep. 2267, 54 Tex. Sup. Ct. J. 1428

END OF DOCUMENT

© 2015 Thomson Reuters. No Claim to Orig. US Gov. Works.